980 A.2d 469

**Joseph Michael JONES**

v.

**STATE of Maryland.**

**No. 3, Sept. Term, 2008.**

Court of Appeals of Maryland.

Sept. 22, 2009.

Brian L. Zavin, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for petitioner.

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for respondent.

Argued before HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, JOHN C. ELDRIDGE, (Retired, Specially Assigned) and IRMA S. RAKER, (Retired, Specially Assigned), JJ.

MURPHY, J.

In the Circuit Court for Harford County, a jury convicted Joseph Michael Jones, Petitioner, of sexual child abuse, second degree sexual offense, and third degree sexual offense. Petitioner concedes that the State's evidence was sufficient to establish that he committed those offenses in Aberdeen, Maryland on December 23, 2004. He argues, however, that he is entitled to a new trial on the ground that the Circuit Court erroneously overruled his objections to (1) the testimony of the victim, and (2) the victim's taped statement to a social worker. In an unreported opinion filed on December 21, 2007, the Court of Special Appeals rejected those arguments and affirmed the judgments of the Circuit Court. Petitioner then filed a petition for writ of certiorari, in which he requested that this Court answer two questions:

I.    Did the trial court err in permitting the six-year old alleged victim to testify where the child demonstrated a clear inability to understand and appreciate the obligation to tell the truth?

II.    Did the trial court err in admitting the alleged victim's taped statement to a social worker?

We granted the petition. *Jones v. State,* 404 Md. 152, 945 A.2d 1270 (2008). For the reasons that follow, we answer "no" to each question, and shall therefore affirm the judgment of the Court of Special Appeals.

### Background

According to Petitioner (in the words of his petition for writ of certiorari):

This case arose out of an allegation of unlawful sexual contact by Tanya Way and her son, Justin, against Mr. Jones in December of 2004. At the time of the alleged incident, Mr. Jones lived in a small two-bedroom house with Ms. Way, her three children, and her mother, Barbara Way. Mr. Jones and Ms. Way's mother were in a romantic relationship and shared one of the bedrooms in the house. Justin, then age five, and his younger brother, Sean, slept in

the second bedroom. Ms. Way slept in the living room with Morgan, her youngest child.

The jury heard four accounts of the events surrounding the allegation against Mr. Jones. The first was from Ms. Way. According to Ms. Way, on the evening of December 23, 2004, she was at home with her children and Mr. Jones. Sean went to sleep at around 8:00. Ms. Way put Justin to bed at around 9:00. When she went to check on Justin about 10 minutes later, Mr. Jones was standing beside Justin's bed with his pants pulled partially down and Justin's hand on his penis. The door to the bedroom was open and the hallway light was on, as they had been when she put Justin to bed, and Sean was still sleeping. Ms. Way cursed at Mr. Jones and asked him "what the F'" he was doing, but he ran back to his room without saying anything. She then called police and took Justin to a neighbor's house, not returning to get Sean, who was still sleeping, until the police arrived. Ms. Way testified that her son's bedroom was located only a few feet from the living room but maintained that she had been unable to hear what was going on in the bedroom because of noise from the television.

\*     \*     \*

The next two accounts came from Justin. Four days after the alleged incident, Justin was interviewed by Noel Francis, a social worker with the Child Advocacy Center. During the interview, which was recorded and played for the jury, he stated that he was ten years old but then said that he was only five years old. When asked by Ms. Noel whether anyone had ever touched his penis, he replied that "Joe" did so with his mouth "[t]en" times at night when he was trying to sleep. Justin denied touching Mr. Jones' penis with his hand or mouth.

Called as a witness, Justin, then age six, provided a different account. Justin testified that Mr. Jones touched his penis with his hand and mouth. He initially stated that this only took place once and that it occurred in his room when he was trying to sleep and his brother was "eating or playing." However, he later testified that he was in his

grandmother's bedroom watching a movie when Mr. Jones touched his penis with his mouth. On cross-examination, Justin agreed that his mother had told him they would play a trick on Mr. Jones but then said that he did not know what a trick was and that "only [his] mom knows those things."

The fourth and final account came from Mr. Jones, who denied having any inappropriate contact with Justin. Mr. Jones testified that on December 23 he had off from his job and was at home watching television. At some point, the police arrived and told him he was under arrest for the sexual assault of Justin. He told the police that it was "a lie."

To establish that Justin was competent to testify, the prosecutor asked him a series of *voir dire* questions suggested by Professor Thomas D. Lyon of the University of Southern California Law School and Professor Karen J. Saywitz of the Harbor–UCLA Medical Center, in an article entitled *Qualifying Children to Take the Oath: Materials for Interviewing Professionals.*[1] The Introduction of this article includes the following statements:

> The purpose of these materials is to assist you in determining whether a child witness understands the difference between the truth and lies and appreciates the importance of telling the truth.
>
> \*       \*       \*
>
> There are two tasks. The first task (truth v. lie) evaluates whether the child understands that the words "truth" and "lie" refer to statements that correspond to reality and statements that fail to correspond to reality, respectively. The second task (morality) determines whether a child

---

1. Thomas D. Lyon & Karen J. Saywitz, *Qualifying Children to Take the Oath: Materials for Interviewing Professionals* (Rev. ed. 2000). This article is cited in Thomas D. Lyon, *Child Witnesses and the Oath: Empirical Evidence*, 73 S. Cal. L. Rev. 1017, 1048 n. 101 (2000), and is available at <http://works.bepress.com/cgi/viewcontent.cgi?article=1008&context=thomaslyon.>.

understands the consequences of telling a lie, for example, that telling a lie will result in "trouble."

In the "truth v. lie" tasks, the child is shown a series of pictures of two children looking at, respectively, (1) a cat, (2) a pizza, (3) a teddy bear, (4) a truck, (5) a horse, (6) a doll, (7) a box of crayons, (8) a duck, (9) an orange, and asked to identify which child in each picture is telling the truth. The following questions were included in Justin's *voir dire* as his response to each picture was sought:

[PROSECUTOR]: This little boy in blue is saying it's a cat and this little boy in red is saying it's a dog. Can you tell us which one is telling the truth?

\*      \*      \*

[PROSECUTOR]: This little girl is saying it's a hot dog. This little girl is saying it's a pizza. Which one is telling the truth?

\*      \*      \*

[PROSECUTOR]: This little boy says it's a book. This little boy says it's a bear. Which one is telling the truth?

\*      \*      \*

[PROSECUTOR]: This little girl says it's a police truck and this little girl says it's an airplane. Which one is telling the truth?

\*      \*      \*

[PROSECUTOR]: This little boy says it's a snake. This little boy says it's a horse. Which one is telling the truth. Can you show us?

\*      \*      \*

[PROSECUTOR]: This little boy says it's a doll. This little boy says it's a football. Which one is telling the truth?

\*      \*      \*

[PROSECUTOR]: This little boy says it's a telephone. This little boy says it's crayons. Which little boy is telling the truth?

\*      \*      \*

[PROSECUTOR]: This little girl says it's a cow. This little girl says this is a duck. Which one is telling the truth?

\* \* \*

[PROSECUTOR]: If I said I was wearing a red suit or red jacket, would I be telling the truth [or] a lie?

\* \* \*

[PROSECUTOR]: If I said you were wearing a red shirt, would I be telling the truth or a lie?

\* \* \*

[PROSECUTOR]: This girl says it's a cookie and this girl says it's an orange. Which one is telling the truth?

\* \* \*

[PROSECUTOR]: This is the judge much like the judge in this courtroom. If you tell the judge something that is not true and you tell him a lie, can you get in trouble?

\* \* \*

[PROSECUTOR]: If I said this chair was purple, would that be a truth or a lie?

\* \* \*

[PROSECUTOR]: Justin, if I said that the police officer was sitting right next to you, would that be a truth or a lie?

\* \* \*

[PROSECUTOR]: Now, if I said he was sitting over here, would that be a truth or a lie?

The following transpired after the prosecutor and Petitioner's trial counsel advised the Circuit Court that they had no further questions:

THE COURT: Any argument on the issue of the competency to testify?

[PETITIONER'S COUNSEL]: I'll go first, Your Honor. Justin certainly made [an] idiot out of me because I predicted that he would sail right through all of this having been thoroughly prepared and frankly he did, I would argue, very poorly. There were a number of answers that were simply

wrong. Once I have counted through the sort of slide presentation, I counted—

THE COURT: Well, to sum it up on the slide show presentation, he gave the same answer for every question; that is, it is the red person. The red person was the answer every single time. Regardless of the right answer it was always the red person. I was keeping track of where he was right and where he was wrong and then taking note of where blue versus red, and he has a very strong preference to red, wearing red himself. I think even agreed with [the prosecutor] or thought she was wearing red. I would agree with your assessment on the slide show presentation he did poorly. Once again, every answer in essence was the same; he pointed to the red person every single time.

\* \* \*

[PETITIONER'S COUNSEL]: I'm looking through the *Perry* case[, *Perry v. State*, 381 Md. 138, 848 A.2d 631 (2004),] we talked about, which is sort of one of those nice Law Review opinions on the topic of competency. I'm looking for the language as to specifically what factors of competency, because it is my recollection it is not just knowing the difference between truth and a lie but that the Court also is supposed to examine as to the child's ability to—well, bear with me, Your Honor.

THE COURT: I think from other cases the ability to relate was the *Matthews* case, [*Matthews v. State*, 106 Md.App. 725, 666 A.2d 912 (1995),] ability to observe, to understand, to recall, and to relate happenings while conscious of a duty to speak the truth.

[PETITIONER'S COUNSEL]: Yes. Justin here spoke of the duty to speak the truth and had sort of an obsession for someone who turned six years of age earlier this month, he has a birthday on I believe August the 9th, but I think it is on the issue of—as Your Honor said, it is on the issue of the ability to recall and relate happenings that I think is where he really falls apart. He did not demonstrate any ability to be consistent, answered a question as what was the truth or

a lie, and I think in Your Honor's perception based on an apparent affection for the color red. So, while he could articulate the importance of speaking the truth, I think it is in his ability to perceive and retain information where he falls down and hence his inability to be consistent with regard to [prior contact with the prosecutor]. I would urge that Your Honor find him not competent to testify.

\* \* \*

[PROSECUTOR]: ... You know, he is six years old. I think he is intimidated. I believe he is competent to testify. If there is a question as to his ability to recall, I'll bring him back in and ask some specific questions with regards to family or something like that if it is recall rather than truth and a lie that the defense has a problem with.

\* \* \*

[PETITIONER'S COUNSEL]: ... I would object to her bringing Justin in again and trying again. [The prosecutor] rested on what she had. Clearly this is a close decision and a tough decision. I don't think it is fair if she can keep bringing the child in until she may be able to get enough right answers to meet her burden. She is the one in charge of trying to voir dire the child, it was Your Honor's request that she do it, and she rested. I would ask that she be held to what she has done so far.

THE COURT: Well, if I were dealing with an adult witness I would agree with you one hundred percent. I'm not dealing with an adult witness, I'm dealing with a six year old child who is allegedly the alleged victim of a crime. I'm very sensitive to the [Petitioner's] rights, but I'm also sensitive that we're dealing with a six year old. I don't see any significant damage that is being done to let the State ask some more questions on that issue. I'm not concerned as to the consequences of not telling the truth. I think Justin passed the test. The issue is exactly what [Petitioner's counsel] related and I think we have summed it up that

he scored some points and flubbed some points. Ironically where he did poorest was on the rehearsed part.

\* \* \*

THE COURT: ... Quite honestly I think he did fairly well when you "ad-libbed" and went around the courtroom.... I'll let you bring him back and we'll see where it leads us. I'll let you ask him a few additional questions.

When Justin returned to the witness stand, only the prosecutor asked him any questions. The following transpired after Justin's *voir dire* had been completed:

THE COURT: Any additional argument by either of you?

\* \* \*

[PETITIONER'S COUNSEL]: ... I would say that generally I agree with [the prosecutor] that his recall about who slept where and so on which is something that took place over a fairly extended period of time in the house in Aberdeen where these events are to have alleged to have occurred was consistent with my understanding of the facts. But I think it is important that those are things that he was testifying to that were I gather the same every night and every day for months as opposed to a one time event, which is what caused the allegation and caused the arrest of Mr. Jones on December the 23rd. He could not remember his last birthday he said but then later on remembered going to McDonald's for his birthday. He was asked a question about pizza at McDonald's and he may have done well, but because his birthday was at McDonald's. He does not remember whether he got wet or whether it rained yesterday.

\* \* \*

[PETITIONER'S COUNSEL]: The [*Perry*] case says, Professor Wigmore states the essential as capacity for observation; capacity for recollection; capacity for communication, including ability to understand question put and to frame and express intelligent answers;—that one lost me, but that's what it says—and, a sense of moral responsibility

to tell the truth.  I will concede that he expressed a sense of understanding of the punishment aspect of not telling the truth, but given the number of errors he has made here I would argue that his capacity for observation, recollection, and his ability to communicate, which means understanding the questions and to express intell[i]gen[t] answers, are all lacking.  Again, this is a serious case, serious for both sides.  This child will take the stand as an accuser.  It has been my experience that jurors will try to allow for the child's youth, and cross examining a child is a very difficult matter. . . . I would argue that in fairness to Mr. Jones that he should not be put in jeopardy for a considerable portion of his life when there is so much doubt about the child's ability to observe, recollect, and communicate.

After taking a brief recess to "read the portion of *Perry* that I have been reading quickly as [counsel] argued to me [and] compare my notes," the Circuit Court delivered the following on-the-record ruling:

Once again, we're at the part of the proceedings where the Court does have to determine the competency of this proposed witness.  I have been cited to *Perry versus State*, 381 Md. [138, 848 A.2d 631], 2004, I guess the most recent compilation or discussion of the law in regard to that.  It has been cited by everybody where they cite Professor Wigmore, "the essential requirements as capacity for observation; capacity for recollection; capacity for communication, including ability 'to understand questions put and to frame and express intelligent answers;' and, a sense of moral responsibility to tell the truth."  They also cite Wharton's Criminal Evidence right after that.  Of course, we had a dispute whether it is in a footnote or not.  In my version it is not in a footnote.  Again, it talks about things there.  I would also cite what I was going off of earlier, that is *Matthews versus State*, a 1995 case, which says basically the same thing.  That's in the footnote to Section 9–103 where it talks about the child's reasonable ability to observe, understand, to recall, and to relate happenings while conscious of a duty to speak the truth.  So, quite frankly this child with

the slide show presentation or whatever you want to call it, I'm not being derogatory, but the bell and whistle presentation, quite frankly did poorly. I mean, he got a number of them right. But the ones that he got right he was always giving the same answer, and that is the child wearing the red shirt, which was on the right-hand side of the screen or the page and blue was on the left. So, whether he has some aversion to blue or a particular like of red, I don't know. Certainly I think for lack of a better term he certainly flubbed that portion of the examination concerning competency. However, after that when he went to [the prosecutor], for lack of a better term ad-libbing, and I could tell from the visible panic in her face and the frantic look in her eyes when she was afraid that the bow was under water, she was ad-libbing and was going around the room and asking things and quite frankly I think he did well there. Perfectly? No. As we have pointed out, there are shortcomings.... In any event, I thought he passed that portion of it. I did allow the State to bring him back on the issue of his ability to observe and relate, and I frankly think he passed that portion. So, the Court, as to his appreciation of the obligation to speak the truth, I think he was very strong in understanding and expressing that. So, the Court does find that he is competent to testify and will allow him to so testify.

Justin was interviewed by Noel Francis, a Licensed Clinical Social Worker, on December 27, 2004. That interview was recorded on an audiotape and a videotape. Because the State had not provided Petitioner's trial counsel with timely notice of its intention to play the videotape of that interview, the Circuit Court ruled "that only the audio tape of which [the defense] had notice can be played." The following transpired during a hearing on the issue of whether the State was entitled to play the audiotape:

[PETITIONER'S COUNSEL]: ... I would argue that the basic technique is impermissibly suggestive. The technique is one where the interviewer, Ms. Francis, essentially goes through a lengthy session of meaningless questions. I

understand that there is a point to try to build some communication with this child, but horses, various animals, colors and so on, and with each correct response there is effusive praise and there is just kind of moving on if the answer is incorrect. Then finally Ms. Francis, who is there with a purpose—I'm looking for the exact question—If somebody touches you in your private part, is that a good touch or bad touch? Bad. That's right. Has that ever happened to you? Yeah? Tell me what happened. And so on. So, she has built up this praise for positive responses. She asks a question that suggests that has anybody ever done this to you that there is going to be a praise for a positive response and then it basically continues from there. So, the entire mode of the interview is suggestive. There are some indicators of potential problems. For example, this child is five years of age according to him at that time and according to the information that we have. I believe his birthday—this is December the 27th I think we just heard and his birth date is in early August. So, he was five and not quite five and a half at that time. He is asked how many times has this happened that Joe put his mouth on your penis and he says ten. Your Honor, I doubt that he knows ten or can count to ten. So, the information that we are getting is not reliable in that analysis. In addition, we have heard from the child there in trial. The child in trial talked about the incident where mom comes into the room and says that she saw Mr. Jones with his pants down and the child touching Mr. Jones' penis. The child talks about that, but does not talk in his testimony here about any incidents of Mr. Jones performing fellatio on him. Well, that is the main thing that is talked about in this statement. So, there is inconsistency between the two, which I think suggests that it is not reliable. I would argue that Ms. Francis clearly tries to direct the interview into areas where it does not go, such as did the child put Mr. Jones' penis in his mouth, and she does not get a response to that. That would be my argument. Finally, the child has been here and the child has testified. I understand that the statute

would seem to apply in this situation. I would just argue I think there [may be] a due process violation if the State gets to keep putting in statements where we weren't present and didn't have a right to be involved and cross examine at that time. You know, it is not the same to have the right to cross examine a child here yesterday about the things that he did say happen and then to have the child on the stand via an audio tape or videotape—audio is what we're dealing with here—where we don't have the opportunity to cross examine the child about the things that were not included in yesterday's testimony. Maybe I guess a point can be made that I would have brought those up. I would probably be so readily post-convicted if I did that. I would submit on that. I would just say I did it and I'm not sure it was a good idea. So, I think there is a distinct disadvantage.

THE COURT: You are saying yesterday there was no mention by the young boy about acts of fellatio?

[PETITIONER'S COUNSEL]: Yes, Your Honor.

THE COURT: Of course, today there is some reference to that.

[PETITIONER'S COUNSEL]: In fact, it happened ten times. So, I have never had a chance to cross examine him about that. I'm just wondering if the use of this tape doesn't deprive us of a due process right. Doesn't it put us in an unfair situation if we exercise that right or attempt to exercise that right? Let's suppose that yesterday I had tried to go into that and had asked the child what about didn't you say that he performed fellatio on you, in more appropriate words for the child's age, and the child said no, then what box am I in? The jury is going to wonder why I have asked that question. So, I can't say that. First of all, I would argue that it bears indicators that it is impermissibly suggestive if you examine it as the statute requires and I would, second of all, argue that the use of this audio tape is unfair, a great risk to cross examine the child about the

material that would come in on this subject today, and ask that it be kept out entirely for both of those reasons.

\*       \*       \*

THE COURT: For this, we have to rundown the factors in the statute. The Court has to make a preliminary decision as to the guarantee of trustworthiness. The child victim's personal knowledge of the event. Well, I'll adopt [the prosecutor's] comments on that. He certainly indicated that. Number two, the certainty that the statement was made. We're certain that the statement was made. We're hearing the audio tape and the child does say it with certainty. As to the apparent motive to fabricate or exhibit partiality by the child victim, including interest, bias, corruption, or coercion. There really isn't anything that would indicate that this five year old would have that. I understand the argument and that is something that you can argue to the jury, but at this point I'm not seeing or hearing anything going to the five year old. Whether the statement was spontaneous. It wasn't spontaneous. It was directly responsive to questions. The timing of the statement. It certainly didn't happen the next day, but it is only four days later. It certainly could have been closer. It certainly could have been a closer. I understand the reason for the timing. Factor six, whether the child victim's young age makes it unlikely that the child victim fabricated the statement that represents a graphic, detailed account beyond the child victim's expected knowledge and experience. Quite honestly I have heard more graphic and more detailed accounts from child victim's than what was given here. However, I do note, as [the prosecutor], the concept of having a sexual organ in a mouth is certainly not something that would be in a typical young person's experience or knowledge. Appropriateness of the terminology of the statement to the child victim's age. Certainly it was very age appropriate. We don't have him using terminology that would indicate somebody spoon feeding him, et cetera. It was very age appropriate. The nature and duration of the abuse or neglect. Of course, he uses the term how many times, ten times, and this was kind of reminiscent of his

testimony yesterday where he fixated on the color red. I note ten has some significance for this young man in that when asked his age he is ten. I think he did that yesterday also. He did it with Ms. Francis and then she says come on or words to that effect and then, okay, I'm five. So, a little concern here throwing out the number ten, but we do have the testimony yesterday that would indicate on the one hand he says it only happened once, it didn't happen twice, but then again he gives two different rooms. Next we have the inner consistency and coherence of the statement. Well, this is in response to a dialogue or questioning by Ms. Francis. It isn't really a narration. So, there isn't an awful lot of opportunity for inner consistency. It is coherent. From the audio tape I can't tell. It doesn't sound like he was suffering from pain or distress, but we have the audio tape. So, off of what I have heard there is no evidence of pain or distress. We have the extrinsic evidence that we have heard already to show that the [Petitioner] had an opportunity to commit this act. We have already discussed and certainly there is use of leading questions. I certainly understand and will adopt [the prosecutor's] characterization of how some of the questions began and then the use of the leading questions. There certainly is a use of leading questions. The last one is the credibility of the person testifying about the statement. Well, really what we have had is the actual audio tape. So, we're not talking about somebody else giving a rendition of something. I have heard it with my own ears off of the audio tape. Weighing all of the factors, the Court will find that it satisfies the requirement for the particularized guarantees of trustworthiness and I will allow the State to play the tape.

As stated above, Petitioner was convicted of three charges, his convictions were affirmed by the Court of Special Appeals, and this Court granted his petition for writ of certiorari.

## Discussion

### I.

In *Perry v. State*, 381 Md. 138, 848 A.2d 631 (2004), this Court stated:

The determination of a child's competence is within the sound discretion of the trial judge. *Horsey v. State,* 225 Md. 80, 82, 169 A.2d 457, 458 (1961); *Robert v. State,* 220 Md. 159, 165, 151 A.2d 737, 739 (1959); *Saldiveri v. State,* 217 Md. 412, 419, 143 A.2d 70, 74 (1958); *Freeny v. Freeny,* 80 Md. 406, 409, 31 A. 304, 305 (1895); *Matthews v. State,* 106 Md.App. 725, 740, 666 A.2d 912, 919 (1995), *cert. denied,* 341 Md. 648, 672 A.2d 623 (1996); *Jones v. State,* 68 Md.App. 162, 165, 510 A.2d 1091, 1093 (1986); *Reckard v. State,* 2 Md.App. 312, 318, 234 A.2d 630, 633 (1967), *cert. denied,* 248 Md. 723, 238 A.2d 235 (1968). Absent an abuse of discretion, that determination will not be disturbed on appeal. *Matthews,* 106 Md.App. at 740, 666 A.2d at 919. As noted by Professor Wigmore on the question of child competency,

the trial court must be the one to determine finally, upon all the circumstances, whether the child has sufficient intelligence according to the foregoing requirements:

Brewer, J., in *Wheeler v. United States,* 159 U.S. 523, 524, 16 S.Ct. 93, 40 L.Ed. 244 (1895): The decision of this question rests primarily with the trial judge, who sees the proposed witness, notices his manner, his apparent possession or lack of intelligence, and may resort to any examination which will tend to disclose his capacity and intelligence, as well as his understanding of the obligations of an oath. As many of these matters cannot be photographed into the record, the decision of the trial judge will not be disturbed on review, unless from that which is preserved it is clear that it was erroneous.

2 Wigmore, Evidence § 507 (Chadbourn rev. 1979).

The age of a child is not the test used to determine if a child is competent to testify. *Matthews,* 106 Md.App. at 741, 666 A.2d at 919. Rather, the test is "whether the witness has intelligence enough to make it worthwhile to hear him [or her] at all and whether he [or she] feels a duty to tell the truth." *Brandau v. Webster,* 39 Md.App. 99, 104, 382 A.2d 1103, 1106 (1978). The trial court must determine

the child's "capacity to observe, understand, recall, and relate happenings while conscious of a duty to speak the truth." *Jones v. State,* 68 Md.App. 162, 166–67, 510 A.2d 1091, 1094 (1986). 5 Professor Wigmore states the essential requirements as: (1) capacity for observation; (2) capacity for recollection; (3) capacity for communication, including ability "to understand questions put and to frame and express intelligent answers;" and, (4) a sense of moral responsibility to tell the truth. 2 Wigmore, Evidence § 506 (Chadbourn rev. 1979). Finally, as stated in Wharton's Criminal Evidence, the test of a child's competency is,

> intelligence; an understanding of the obligation to tell the truth; knowledge of the nature of an oath; ability at the time of the occurrence to accurately perceive it; ability to remember the occurrence; capacity to actively communicate the memories; and ability to understand and respond to simple questions about the occurrence. It is not necessary that the child be able to define an oath. The child need only understand that, upon taking an oath, the child has promised to tell the truth. A child's competency is not affected by the fact that the child makes contradictory statements on the witness stand.

2 Barbara E. Bergman, Nancy Hollander, Wharton's Criminal Evidence § 7:16 (15th ed. 1998).

The types of questions usually asked to determine if a child is competent to testify are not related to the trial itself and include questions like "Where do you go to school?," "How old are you?," ... "Do you know what happens to anyone telling a lie?." Robin W. Morey, *The Competency Requirement for the Child Victim of Sexual Abuse: Must We Abandon It?,* 40 U. Miami L. Rev. 245, 263 (1985) (discussing voir dire of child witnesses) (footnote omitted). The questions asked should not be "complicated or tricky" and should include questions that ferret out if a child understands the concept of truth and falsehood. Morey, 40 U. Miami L. Rev. at 263 n. 78. For example, "Q. . . . If I were to say that I'm wearing a red jacket, would that be a lie or

would that be the truth?, A. A lie[, and] Q. And why would it be a lie?, A. Because you're wearing a brown jacket." *Id. Id.* at 148–50, 848 A.2d at 636–38 (footnote omitted).

■■■ Although it is frequently stated that the trial judge has "discretion" to admit or exclude evidence, the trial judge does not have discretion to admit the testimony of a witness who is not competent to testify. In *Weeks v. State,* 126 Md. 223, 94 A. 774 (1915), this Court stated that, "[t]he question of the competency of a witness is one to be determined by the Court, and should be disposed of as soon as it arises and before the witness is allowed to testify to the facts in issue[.]" *Id.* at 228, 94 A. at 775–76. In *Johnston v. Frederick,* 140 Md. 272, 117 A. 768 (1922), this Court stated that, "[t]he test of incompetency is whether the witness has 'sufficient understanding to appreciate the nature and obligation of an oath and sufficient capacity to observe and describe correctly the facts in regard to which [he or] she is called to testify.'" *Id.* at 281, 117 A. at 771 (citation omitted in original). As the Circuit Court pointed out, "capacity to describe correctly" includes the ability "to understand," and the ability "to recall." A competency *determination,* based upon the application of a *test,* requires that the trial court make findings of fact. In the case at bar, the Circuit Court expressly *found* "that [Justin] is competent to testify." We apply the "clearly erroneous" standard of review to that factual finding.

From our review of the record, we are persuaded that the Circuit Court was not clearly erroneous in finding that Justin (1) "passed" both the "truth v. lie" and "ability to observe and relate" portions of the test, and (2) was "very strong" in "his appreciation of the obligation to speak the truth." In fact, Petitioner's trial counsel expressly conceded that Justin "expressed a sense of understanding of the punishment aspect of not telling the truth[.]"

## II.

■■ When ruling on the admissibility of a tape recorded interview offered into evidence pursuant to § 11–304 of the

Criminal Procedure Article (CP), the trial judge must comply with the foundational requirements of that statute, including the requirement that the court "make a finding on the record as to the specific guarantees of trustworthiness that are in the statement[.]" CP § 11–304(f)(1). The "clearly erroneous" standard of review is applicable to the factual findings required by this statute. From our review of the record, which includes the Circuit Court's on-the-record analysis of the factors set forth in the statute, we are persuaded that the Circuit Court was not clearly erroneous in finding that the audio tape "satisfies the requirement for the particularized guarantees of trustworthiness."

In *Myer v. State*, 403 Md. 463, 943 A.2d 615 (2008), this Court held "that the trial court abused its discretion in denying [the defendant on trial for sexual abuse of a minor] the opportunity to cross-examine the child-witness after the video-tape [of an interview of the child-witness] had been admitted into evidence [pursuant to § 11–304 of the Criminal Procedure Article]." *Id.* at 466, 943 A.2d at 617. In that case, however, the Petitioner's trial counsel expressly requested that the child be recalled for additional cross-examination after the videotape was received into evidence. In the case at bar, although Petitioner's trial counsel represented his client with much vigor, the defense did not request that Justin be recalled after the audiotape was played. Under these circumstances, Petitioner is not entitled to a new trial on the ground that the Circuit Court did not *sua sponte* recall Justin for additional cross-examination.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; PETITIONER TO PAY THE COSTS.**