Circuit Court for Wicomico County
Case No. 22-I15-0008
Case No. 22-I15-0009

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2631

September Term, 2015

_____

IN RE:  J.J. AND T.S.

_____

Graeff,
Friedman,
Sharer, J. Frederick
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Graeff, J.
_____

Filed:  December 21, 2016

This case arises from orders of the Circuit Court for Wicomico County, sitting as a juvenile court, adjudicating J.J. and D.J.,[1] appellees, children in need of assistance ("CINA")[2] and committing them to the Wicomico Department of Social Services (the "Department"), also an appellee, for placement in foster care.

On appeal, father, Mr. J., and mother, Ms. B., present multiple questions for our review,[3] which we have consolidated and rephrased as follows:

---

[1] D.J. is also known as J.J., Jr., by his middle name, D, or T.S. To avoid confusion, we shall refer to him as D.J.

[2] A "CINA" is a child whom a court has determined is in need of judicial intervention because he or she has been abused or neglected, and whose parents or guardian either cannot or will not adequately care for the child. *See* Md. Code (2015 Supp.) § 3-801(f) of the Courts & Judicial Proceedings Article ("CJP").

[3] Mr. J. presents the following four questions for this Court's review:

1. Did the court err by finding that the child's statements possessed reasonable particularized guarantees of trustworthiness pursuant to Md. Code (2015 Repl. Vol.) § 11-304 of the Criminal Procedure Article ("CP")?

2. Did the court err by quashing the subpoena for Trooper Hale?

3. Did the court err in finding the children CINA, where there was insufficient credible evidence of abuse?

4. Did the court err by denying the father any contact with his children?

Ms. B. presents the following questions for this Court's review:

1. Did the trial court fail to properly apply the provisions of CP § 11-304 and allow untrustworthy hearsay evidence to support the CINA finding?

   A. The court denied Mother's cross examination of the social worker concerning CP § 11-304 factors. (continued . . .)

1. Did the court err in applying the provisions of Md. Code (2015 Repl. Vol.) § 11-304 of the Criminal Procedure Article ("CP") and admitting evidence of J.J.'s out-of-court statement to a licensed clinical social worker?

2. Did the court err in finding the children CINA?

3. Did the court properly suspend Mr. J.'s visitation with the children?

4. Did the court properly extend the children's shelter care and postpone adjudication beyond the 30-day time period provided for in Md. Rules 11-112 and 11-114?

For the reasons set forth below, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

J.J., age 9 at the time of the proceedings below (DOB: 4/11/06), and D.J., age 3 (DOB: 12/1/11), are the children of Ms. B. and Mr. J. In August 2015, J.J. and D.J. were living with Mr. J.; Ms. B. was incarcerated. On August 30, 2015, the Department became involved after J.J. reported that Mr. J. had sexually abused her. J.J. reported to a child protective services forensic investigator, Tiffany Gattis, that Mr. J. had rubbed his "wee-

---

(. . . continued)
       B. The court failed to examine the child.

       C. The court failed to compel discovery concerning DNA evidence.

       D. The court failed to require WCDSS to follow the notice provisions of CP § 11-304 and thereby delayed the proceeding.

  2. Was the trial court's CINA finding clearly erroneous?

  3. Did the trial court violate the provisions of Rules 11-112 and Rule 11-114 by extending shelter care and continuing to postpone adjudication beyond the 30 day limit?

wee" on her "private part" and made her "suck his wee-wee." The Department removed the children from Mr. J., which led to the CINA determination at issue in this appeal.

### Events Leading to the September 2015 Shelter Care Hearing

Ms. B. and Mr. J. had three children together – J.J., D.J., and Ja.J. Ms. B.'s oldest daughter, N.R., was sixteen years old at the time of the disposition hearing and lived with a maternal aunt. Ms. B.'s youngest daughter, T.S., was six years old and lived with her father.

The Department, as set forth in its report to the court, had a long history with the family. In 2008, the Department received a child welfare referral based on a report that a former tenant of the family's home had used his key to enter the home without the family's consent and was discovered masturbating while standing over N.R.'s bed as she slept. Mr. J. declined to be interviewed by police, and the case was closed.

In December 2011, after D.J. was born prematurely, Ms. B. tested positive for marijuana. On February 28, 2012, the Department received a report that, although D.J.'s pediatrician determined that he needed a follow-up with a specialist in retinopathy of prematurity, Ms. B. missed several appointments. There also were concerns that Ms. B. was not giving her other children medications as prescribed, Ms. B. had problems with marijuana and alcohol, there was no food in the home, there were too many people living in the home, and Ms. B. was hitting the children with a belt and cursing at them. The Department's investigation indicated Ms. B. for neglect, and she was arrested for medical neglect.

3

In April 2012, the Department offered Ms. B. family preservation services. Ms. B. signed a service plan to enroll in drug treatment, follow all recommendations, maintain all of the children's appointments, and enroll in GED classes. She did not follow through with these tasks. Ms. B. denied that she had a substance abuse problem, and she did not believe she needed treatment. Mr. J. had not been a consistent parent to his children; he had been in and out of Ms. B.'s life due to domestic violence and incarceration.

Between September 2012 and September 2014, the Department worked intensively with the parents "to try to help them address their drug use, the domestic violence in [their] relationship [and] to help them get and maintain housing." Both parents, however, continued to abuse alcohol and marijuana, and domestic violence was an ongoing issue. The Department offered Mr. J. mental health services, but it was never able to satisfactorily address his issues because his engagement was sporadic.

In June 2012, Ms. B. reported to police that N.R. was a runaway or had been kidnapped. The Department determined, however, that Ms. B. had allowed N.R. to visit her family, and N.R. did not want to return to Ms. B.'s home. The police contacted the Department regarding the condition of Ms. B.'s home, and the Department worked "intensively" with Ms. B. and her children throughout July 2012, when the family moved to Florida, without notifying the Department or extended family.

In August 2012, while the family was living at a motel in St. Petersburg, Florida, Ja.J., then five years old, drowned in the motel pool. N.R., who was then 13 years old, had been left in charge of her younger siblings, ages 6, 5, and 2. When Ja.J. was discovered at

4

9:40 p.m., Ms. B. and Mr. J., were in the hotel room. Child neglect allegations were indicated for both Ms. B. and Mr. J.

In September 2012, the family returned to Wicomico County. They resided with family members, and when the Department's social worker visited, all of the children, except N.R., were sleeping on the floor. N.R. reported that, when they arrived, Ms. B. had pulled her out of the backseat of the car by her hair, pulled her hair, and punched her in the eye. This incident occurred in front of Mr. J., who did nothing to stop it. Ms. B. was removed from the scene in handcuffs, and all of the children were placed in respite care. Ms. B. was convicted of physical abuse and sentenced to serve fifteen weekends in the local detention center. Mr. J. was indicated for neglect and Ms. B. was indicated for abuse.

On January 25, 2013, the Department initiated a sexual abuse investigation to assess allegations reported by then six-year-old J.J., who had disclosed abuse by Mr. J. During an audio and video recorded forensic interview, J.J. stated that, when she and Mr. J. were alone in the master bedroom of the family's former residence, Mr. J. had touched her on her vaginal area and on her buttocks. She could not give an approximate date or time, but she stated that the touching occurred more than once, and there were no witnesses. Mr. J. and Ms. B. denied all allegations of sexual abuse, and the allegation was found to be unsubstantiated, although not ruled out, as J.J. remained consistent with her statements for more than a year.

In March 2013, during a forensic interview in an unrelated case, J.J. disclosed sexual abuse by a 17-year-old male cousin, B.J., while she was residing with a maternal great-aunt for several months. J.J. stated that B.J. had touched her vagina and buttocks. The

Department found the abuse indicated after B.J. admitted to touching J.J. on her vaginal area and having her masturbate him. B.J. was criminally charged with child abuse and sexual offense.

On July 7, 2013, police were called to the family home due to a domestic violence incident. Mr. J. and Ms. B. were drinking and fighting with each other in the street while Mr. J. held baby D.J.

In July 2014, CINA petitions were dismissed for all of the children, and the Department continued to provide family support services. On October 22, 2014, Ms. B. filed for a protective order against Mr. J., but she failed to appear for the final protective order hearing.

On October 27, 2014, the Department again received a referral, which alleged that J.J. had been sexually abused by Mr. J. During the forensic interview, J.J. reported that Mr. J. licked her vagina, which she referred to as a "Yorkie," for 20 minutes. J.J. stated that Mr. J. had never touched her sexually or licked her in the past. She also reported that, on the same weekend, she witnessed Mr. J. kicking Ms. B. out of the home, resulting in a domestic dispute that she witnessed. Ms. B. subsequently returned to the house, but Mr. J. had another woman in the home, who was "sucking [Mr. J.'s] 'do—do.'" J.J. could not explain, however, what that meant.

On November 10, 2014, Mr. J. and Ms. B. were interviewed separately by the Wicomico Child Advocacy Center. Mr. J. stated that J.J. told him "that she was instructed by her grandmother to make the statements related to sexual abuse." Ms. B. stated "that she fabricated the abuse allegation because she was angry" at Mr. J. for cheating. Based

on inconsistent information and evidence of coaching, the final disposition was unsubstantiated for sexual abuse. Because the Department could not determine whether the abuse did or did not occur, the determination of unsubstantiated sexual abuse "appeared to be most appropriate."

On December 22, 2014, a warrant issued for Ms. B.'s arrest. She subsequently was incarcerated for violating her probation.

On August 30, 2015, while Ms. B. was still incarcerated, the Department was contacted by the Fruitland Police Department, which had received a complaint regarding the alleged sexual abuse of J.J. The Department, along with the police and the Wicomico Child Advocacy Center, conducted a joint investigation. J.J. disclosed that, on August 27 and August 29, 2015, Mr. J. "had sexual intercourse with her and forced her to perform oral sex on him." A SAFE exam was performed,[4] but J.J. had brushed her teeth, showered, urinated, and defecated prior to the exam. The preliminary results indicated that J.J. had a possible "notch" to her vaginal opening that could be indicative of sexual abuse.[5]

On August 31, 2015, the children were placed in shelter care.

---

[4] A SAFE exam is a sexual assault forensics examination. *Samba v. State*, 206 Md. App. 508, 525 (2012).

[5] The amended CINA petition alleged that a second exam was conducted, and it included a report issued by Dr. Jennifer Wehberg, finding no physical indications of sexual abuse but stating that the "exam CAN be consistent with disclosure." It appears, however, that no evidence was presented in regard to this allegation or report.

## September 2, 2015, Shelter Care Hearing

At the September 2, 2015, shelter care hearing, Mr. J. and Ms. B. agreed to placement of the children in shelter care for 30 days pending the adjudicatory hearing. The adjudication hearing was scheduled for October 7, 2015. Mr. J. was scheduled to have one supervised visit with D.J. between the shelter care hearing and the next hearing, but the court ordered that there would be "no visitation with [J.J.] at this time given the circumstances that have been presented."

## Postponements

As discussed in more detail, *infra*, there were a couple of postponements prior to the ultimate adjudicatory hearing. At a November 18, 2015, status conference, the court was advised regarding the status of Mr. J.'s visitation with the children. Although the Department had provided Mr. J. with transportation, he had missed one scheduled visitation with D.J. and arrived late on two other occasions. Counsel informed the court that J.J. had begun seeing two therapists: one to address the trauma that she had experienced, and one to address her issues with food and weight gain. Danielle Brennan, a foster care worker for the Department, reported that the trauma therapist was "supportive" of J.J.'s request to have no contact with Mr. J. Additionally, the therapist supported only supervised visitation between J.J. and Ms. B.

## CP § 11-304 Hearing

On November 30, 2015, the court held a hearing pursuant to Md. Code (2015 Repl. Vol.) § 11-304 of the Criminal Procedure Article (the "CP § 11-304 hearing") to address the admissibility of an out-of-court statement that J.J. made to a member of the Department.

8

During the time period from May to August 2015, Mr. J. lived alone with J.J. and D.J. Ms. B. was incarcerated.

Ms. Gattis, a social worker who had been a member of the Department for eight years, and the Child Advocacy Center for seven years, testified regarding her interview of J.J. on August 30, 2015. She explained that the Child Advocacy Center takes a "holistic approach to investigating and assessing reports of abuse and/or neglect" under a system called RATAC, which is an acronym for "rapport, anatomy, touch, abuse and closure," a "nationally recognized forensic interviewing process." Under the RATAC approach, non-biased, non-leading questions are asked when interviewing children who may have been sexually abused. Ms. Gattis underwent "substantial training to become certified in the RATAC process," including passing a written examination after attending 40 hours of training. She also attended the "advanced RATAC protocol training," which includes a three-day session, after which she was required to submit a video of interviews for critique.

On August 30, Ms. Gattis received a report from Trooper Donna Hale, indicating that J.J. had alleged that Mr. J. had sexually abused her. The forensic interview took place that evening, between 7:00 and 7:30 p.m., in a treatment room in the emergency room. Trooper Hale was present, and the interview was audio recorded; video recording equipment was not available at the hospital. The audio tape was admitted at the motions hearing without objection.

Ms. Gattis previously had interviewed J.J. concerning an investigation that ended in December 2014, but they had no contact in the interim. J.J. answered truthfully the general questions Ms. Gattis asked about where she attended school. She understood the concept

of days of the week. Given J.J.'s age, Ms. Gattis tried to gauge J.J.'s developmental level and asked questions that she could answer appropriately.

When J.J. first saw Ms. Gattis, she appeared "happy to see a familiar face." Ms. Gattis stated that J.J. is "very outspoken and speaks with volume." At the beginning of the interview, she was "sitting upright." As the issue of abuse arose, however, "her voice became lower in volume," she began "to cave in upon herself," and her "shoulders began to hunch over." She also "began chewing on a strap that she had in her hand off of her sleeve." J.J. "became distant" and "did not maintain eye contact." She "peered down" and "started to make noises to avoid answering" Ms. Gattis. She "began asking questions about things that were not relevant to the interview," was "very distracted with wanting to eat . . . and asking . . . about when her next meal would come," and asked to stop the interview. Prior to that, she had been "very engaged" and "very observant about what was going on with" Ms. Gattis.

J.J. also drew a picture of Mr. J.'s penis, and she used her hands to demonstrate how long and wide it was prior to drawing the picture.[6] The picture was consistent with what J.J. demonstrated with her hands. J.J. became upset when she made spelling mistakes and scribbled out some of the words on the picture. She had written the statement that "my dad made me suck his wee wee."

Ms. Gattis described how grotesque it was to see a nine year old child demonstrate "what happens when you have to suck someone's wee wee." J.J. performed an act with a

---

[6] The drawing J.J. made during the interview of Mr. J.'s penis was admitted into evidence.

pen that can be heard as clicking during the interview "displaying what sucking a wee wee would look like." J.J. also made a "very spontaneous" comment that D.J. had been upstairs in the bathtub "making a whole bunch of noise" during the abuse. Ms. Gattis addressed J.J.'s prior disclosure of abuse, and she explained that a child who previously had been sexually abused would not necessarily have a more graphic understanding of sex than a child who had not been abused.

After she concluded the forensic interview, Ms. Gattis and Trooper Hale went to the police department, where she interviewed Mr. J. and D.J. Mr. J. stated that J.J. and D.J. had gone to visit their maternal family on Wednesday and returned to his care on Saturday evening. He denied J.J.'s allegations, stating that "he would consider not fighting for his children because it was becoming an old and tiring process to be accused of sexual abuse." He stated that J.J. was "starting [a] mess, again," and "he should have never allowed her to visit [Ms. B.'s] mother, visit her family because they were filling her head with nonsense." Ms. Gattis spoke with D.J., but given his age and maturity level, D.J. did not have any information.

During the CP § 11-304 hearing, Ms. B. and Mr. J. challenged the indicated findings of abuse. The court explained, however, that the "real question" at that hearing was "whether or not this interview was conducted appropriately, and there is guarantees of trustworthiness in light of the questioning and responses in this interview." The court further explained that the out-of-court statement would not "necessarily . . . [be] inadmissible because it is subject to being impeached."

11

**Adjudicatory Hearing**

At the adjudicatory hearing, Ms. Gattis' testimony was similar to her prior testimony. Barbara Flatly, an in-home services supervisor for the Department, testified to the Department's history with the family and the attempt to provide services. The court also listened to the audiotape of J.J.'s interview while reading the transcript.[7]

At the conclusion of the evidence, the court found J.J.'s interview and her statements "to be entirely credible." It further stated that "[n]othing has refuted those statements," and therefore, "the allegations have been sustained."

The court found that there was credible evidence that J.J. disclosed sexual abuse on "8-27-2015 and 8-29-2015," that J.J. was diagnosed with a possible vaginal notch that could be indicative of sexual abuse, that J.J. provided a description of Mr. J.'s penis and drew a picture of it for Ms. Gattis, and J.J. had disclosed to Ms. Gattis that Mr. J. rubbed his penis on her body and had her suck his penis.

The court sustained the following allegations in the CINA petition: paragraph 8(b), that "both parents have extensive histories of being unable to properly care for the children"; 8(c), that Ms. B. "was indicated for neglect for failing to seek medical treatment for" D.J.; 8(d), that Mr. J. and Ms. B. were indicated for neglect in the drowning death of Ja.J. by the State of Florida; 8I, that Ms. B. was indicated for abuse and criminally convicted of assaulting N.R., and Mr. J. "was indicated for neglect for the same incident for not intervening on N.R.'s behalf"; 8(g), that Mr. J. and Ms. B. "have a history of

---

[7] Mr. J. did not testify at the adjudicatory hearing.

12

domestic violence in the home in the presence of the children"; and, 8(i), that Mr. J. "sexually abused [J.J.] on more than one occasion." The court did not sustain paragraph 8(f), that Ms. B. "admits to using alcohol and marijuana as a stress management tool and has not maintained regular participation in a recovery program."[8]

## Disposition

At the disposition hearing, the Department recommended that visitation with the children be suspended for both parents until they engaged in the services needed. With respect to Ms. B., the Department was concerned that she did not believe J.J.'s statements regarding the abuse, and she was not trying to help J.J. through her trauma. At visits, Ms. B. focused her attention on D.J., and was unable to "fully engage" with J.J. Ms. B. often would make derogatory remarks about J.J.'s hair and appearance, she chastised J.J. for her clothing, and she was critical of J.J.'s attempts to impress her. Ms. B. did not appear to reciprocate J.J.'s attempts at affection.

Although Ms. B. had advised that she would go to a shelter or live with her family, rather than move in with Mr. J., the Department had not been able to verify that Ms. B. lived anywhere other than with Mr. J. When the Department transported Ms. B. to and from appointments or visitation, she was at Mr. J.'s home, and when dropped off, Ms. B. had a key and let herself into the house. The Department reported that Ms. B. appeared to want to continue to have a relationship with Mr. J., "putting that need above the needs of her children." Despite a no-contact order, Ms. B. had J.J. call Mr. J. during a visit to tell

---

[8] Due to a medical issue with Ms. B., the disposition hearing could not be held that day, and both parents consented to a hearing in January 2016.

13

him that she loved him and missed him while a staff person was taking D.J. to the restroom. The Department believed that anxiety and depression, combined with substance abuse, were ongoing issues with Ms. B.

With respect to Mr. J., Ms. Brennan, a foster care worker at the Department, testified that he threatened to file assault charges against a child protective services worker who had tapped him on the shoulder. He was non-compliant with program services, including a recommendation for intensive outpatient addiction treatment. Mr. J. also became verbally aggressive with D.J.'s foster parents. During visitations, Mr. J. took D.J. to the bathroom unattended on numerous occasions, despite the Department's instructions that he was not to do so. At "[p]retty much every visit" with Mr. J., there was "some kind of event." He complained that D.J.'s hair needed to be cut, that he had not been fed, and that he was being hurt by another child in the foster home. He repeatedly asked D.J. where he was sleeping and who was sleeping with him in his bed, and he refused to accept D.J.'s responses.

The Department wanted Mr. J. to have psychological testing to determine whether sexual abuse was likely to reoccur, but this had not yet been accomplished. D.J. had begun displaying sexualized behaviors, which caused "serious concerns" to the Department regarding what he "may have seen or witnessed or been exposed to." Mr. J. also refused to sign a service agreement.

At the conclusion of the disposition hearing, the court adjudicated the children CINA, stating as follows:

> I do find that the children are in need of the [c]ourt's intervention. I find they are children in need of assistance. I find that [J.J.] was abused. I further find based on the case law that the [c]ourt's authority extends then

14

also to finding [D.J.] to be a child in need of assistance and to affording him protection.

And I will note for the record in light of counsel's argument, that the [c]ourt may find both parents are unavailable or unwilling to provide proper care, even if only one parent – it was only one parent who perpetuated the abuse or neglect. . . .

In this particular case . . . with regard to the parents, they're denying that this – basically denying it. So I understand they're in the position of coming to court and saying they're not going to cooperate with certain things, but because they deny and don't think they need this intervention.

But I have to say that if you're looking at a situation where your ability to have your child in your care is dependent upon you severing all contact with Mr. J., then if putting their needs first was upper most in your mind, that contact would be severed.

I'm very concerned. I don't find your testimony, Miss B., credible about where you live. I don't know why in the world, if you had to go somewhere every day, you would happen to pick going to Mr. J.'s house if you're, in fact, not living there. So I don't find that to be credible.

So at any rate, I find the children to be children in need of assistance. I find they are in need of the [c]ourt's intervention.

The court then made specific findings that neither "parent is able to provide proper care and attention to the children at this time," and therefore, it committed the children to the care and custody of the Department for appropriate placement.

With respect to visitation, the court ordered that Ms. B. would continue to have visitation with the children, to be supervised by the Department. With respect to Mr. J., the court ordered him to participate in mental health and substance abuse treatment and sign consents for releases. It ordered that Mr. J. would have no visitation with the children, a decision that would be reassessed at the next hearing, when the court could assess his compliance with the court's orders.

15

# DISCUSSION

## I.

Appellants raise several contentions of error regarding the CP § 11-304 hearing addressing the admissibility of J.J.'s statement to Ms. Gattis. Before addressing these contentions, we will first discuss the statutory provisions.

## A.

## CP § 11-304

The Court of Appeals has explained that, although out-of-court statements generally are excluded from evidence as hearsay, "[m]any states, including Maryland, have enacted statutes, sometimes known as the tender years exception, designed to protect the emotional and psychological health of young children alleged to be victims of sexual abuse and to provide for the admissibility of *ex parte* statements . . . under particular circumstances." *Myer v. State*, 403 Md. 463, 479 (2008). Maryland's statute, CP § 11-304, is the "legislatively approved method" governing "the admissibility of hearsay statements by a child abuse victim under [13] in juvenile and criminal court proceedings." *Montgomery Cty. Dep't of Health & Human Servs. V. P.F.*, 137 Md. App. 243, 272 (2001).[9] The statute "addresses the inherent questions of trustworthiness raised by such a young child's out of court statement and balances the need to protect child victims from the trauma of court

---

[9] In 2011, the age was changed from "under the age of 12 years" to "under the age of 13 years." 2011 Md. Laws, Ch. 87 (H.B. 859); 2011 Md. Laws, Ch. 88 (S.B. 768).

proceedings with the fundamental right of the accused to test the reliability of evidence

proffered against him or her." *Id.*

CP § 11-304 provides, in relevant part, as follows:

(a) *"Statement" defined*. — In this section, "statement" means:
(1) an oral or written assertion; or
(2) nonverbal conduct intended as an assertion, including sounds, gestures, demonstrations, drawings, and similar actions.
(b) *Admissibility*. — Subject to subsections (c), (d), and I of this section, the court may admit into evidence in a juvenile court proceeding or in a criminal proceeding an out of court statement to prove the truth of the matter asserted in the statement made by a child victim who:
(1) is under the age of 13 years; and
(2) is the alleged victim or the child alleged to need assistance in the case before the court concerning:

\*\*\*

(iv) in a juvenile court proceeding, abuse or neglect as defined in § 5-701 of the Family Law Article [("FL")].[10]

---

[10] Abuse and neglect are defined in Md. Code (2015 Supp.) § 5-701 of the Family Law Article ("FL") as:

(b) *Abuse.* — "Abuse" means:
(1) the physical or mental injury of a child by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member, under circumstances that indicate that the child's health or welfare is harmed or at substantial risk of being harmed; or
(2) sexual abuse of a child, whether physical injuries are sustained or not.

\*\*\*

(s) *Neglect.* — "Neglect" means the leaving of a child unattended or other failure to give proper care and attention to a child by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of the child under circumstances that indicate:
(1) that the child's health or welfare is harmed or placed at substantial risk of harm; or
(2) mental injury to the child or a substantial risk of mental injury.

17

An out-of-court statement is admissible pursuant to § 11-304I only if it is "made to and is offered by a person acting lawfully in the course of" certain professions, including, as relevant here, a social worker.

CP § 11-304(d) sets forth certain conditions that must be satisfied. As relevant to this case, the statute provides:

> (2)(i) In a child in need of assistance proceeding in the juvenile court under Title 3, Subtitle 8 of the Courts Article, an out of court statement by a child victim may come into evidence to prove the truth of the matter asserted in the statement:
> > 1. if the statement is not admissible under any other hearsay exception; and
> > 2. regardless of whether the child victim testifies.
> (ii) If the child victim does not testify, the child victim's out of court statement will be admissible only if there is corroborative evidence that the alleged offender had the opportunity to commit the alleged abuse or neglect.
> (3) To provide the . . . alleged offender with an opportunity to prepare a response to the statement, the prosecuting attorney shall serve on the . . . alleged offender and the attorney for the . . . alleged offender within a reasonable time before the juvenile court proceeding . . . notice of:
> > (i) the State's intention to introduce the statement;
> > (ii) any audio or visual recording of the statement; and
> > (iii) if an audio or visual recording of the statement is not available, the content of the statement.

CP § 11-304I sets forth further requirements for the admission of a child's out-of-court statement, as follows:

> (e) *Particularized guarantees of trustworthiness*. — (1) A child victim's out of court statement is admissible under this section only if the statement has particularized guarantees of trustworthiness.
> (2) To determine whether the statement has particularized guarantees of trustworthiness under this section, the court shall consider, but is not limited to, the following factors:
> > (i) the child victim's personal knowledge of the event;
> > (ii) the certainty that the statement was made;

(iii) any apparent motive to fabricate or exhibit partiality by the child victim, including interest, bias, corruption, or coercion;

(iv) whether the statement was spontaneous or directly responsive to questions;

(v) the timing of the statement;

(vi) whether the child victim's young age makes it unlikely that the child victim fabricated the statement that represents a graphic, detailed account beyond the child victim's expected knowledge and experience;

(vii) the appropriateness of the terminology of the statement to the child victim's age;

(viii) the nature and duration of the abuse or neglect;

(ix) the inner consistency and coherence of the statement;

(x) whether the child victim was suffering pain or distress when making the statement;

(xi) whether extrinsic evidence exists to show the defendant or child respondent had an opportunity to commit the act complained of in the child victim's statement;

(xii) whether the statement was suggested by the use of leading questions; and

(xiii) the credibility of the person testifying about the statement.

The statute imposes a duty on the court to do certain things after considering the 13 statutory factors. Specifically, the court is required to:

(f) *Role of Court.* — In a hearing outside of the presence of the jury or before the juvenile court proceeding, the court shall:

(1) make a finding on the record as to the specific guarantees of trustworthiness that are in the statement; and

(2) determine the admissibility of the statement.

(g) *Examination of child victim*. — (1) In making a determination under subsection (f) of this section, the court shall examine the child victim in a proceeding in the judge's chambers, the courtroom, or another suitable location that the public may not attend unless:

***

(ii) the court determines that an audio or visual recording of the child victim's statement makes an examination of the child victim unnecessary.

CP § 11-304(f)-(g).

19

Having set out the provision of the statute, we now turn to the particular contentions of error asserted by Mr. J. and Ms. B.

**B.**

**Trustworthiness of J.J.'s Statement**

Mr. J. contends that the court erred in finding that J.J.'s out-of-court statement to Ms. Gattis possessed particularized guarantees of trustworthiness as required by CP § 11-304. In support, he argues that J.J.'s interview "did not demonstrate that she possessed the capacity to be a reliable witness," stating that, in "the absence of evidence that J.J. could appreciate the difference between a lie and truth, and the ability to recall past events, the court could not conclude" that she was competent to testify. Mr. J. further asserts that J.J.'s statements were not trustworthy because she previously had made unsubstantiated allegations of sexual abuse, her responses to questions "ended with an inflection, as if she were responding with a question," she did not like Mr. J. and therefore had a motive to fabricate, her statements were not spontaneous, but were made in response to questions from Ms. Gattis, she had knowledge of sex acts due to sexual abuse by a cousin, and there "were other reasons why J.J.'s statements were unreliable," including "inner inconsistencies." Mr. J. asserts that, because Ms. Gattis' interview "did not demonstrate that J.J.'s statements . . . contained reasonable particularized guarantees of trustworthiness," they should not have been admitted to prove that he sexually abused her.

The Department contends that "the juvenile court complied with the requirements of [CP] § 11-304 when it admitted the audio-recording of J.J.'s statements made during a forensic interview." It argues that the question before the juvenile court did not require a

20

determination of J.J.'s competence as a witness, but rather, the issue was "whether her August 30, 2015 audiotaped statements were sufficiently reliable to be admissible evidence." The Department asserts that the court played the audiotape at the CP § 11-304 hearing, heard testimony, considered the evidence, and then addressed each statutory factor to "establish that J.J.'s statements possessed reasonable particularized guarantees of trustworthiness." The children similarly argue that the court's finding, that J.J.'s statement "was accurate and trustworthy, was not clearly erroneous, and the court properly admitted the statement into evidence."

Mr. J. is correct that, pursuant to CP § 11-304, "a trial judge must make a preliminary determination of whether the young child's statement is sufficiently reliable to be admitted into evidence." *P.F.*, 137 Md. App. at 272. "The statute directs that such hearsay 'may be admissible . . . only if the statement possesses particularized guarantees of trustworthiness.'" *Id.* In that regard, the court must determine whether "the totality of the circumstances that surround the making of the statement . . . render the declarant particularly worthy of belief," i.e., "whether the child was likely to be telling the truth when making the statements." *Prince v. State*, 131 Md. App. 296, 301-02 (2000). The 13-factor test set forth in § 11-304 is designed to guide the trial court's analysis of the trustworthiness of the statement. *Id.* at 302. In reviewing the circuit court's findings of fact pursuant to the statute, we apply the "clearly erroneous" standard of review. *Reece v. State*, 220 Md. App. 309, 319 (2014), *cert. denied*, 442 Md. 195 (2015). *Accord Jones v. State*, 410 Md. 681, 700 (2009).

21

**1.**

**Competency**

We address first Mr. J's argument that the court erred in finding that the statement was trustworthy because there was insufficient evidence to find that J.J. was competent to testify. In this regard, we agree with the Department that J.J.'s competency as a witness was not relevant to the admissibility of her statement to Ms. Gattis.

When interpreting a statute, the Court of Appeals has made clear that "'[t]he cardinal rule . . . is to ascertain and effectuate the real and actual intent of the Legislature.'" *Bowling v. State*, 227 Md. App. 460, 473 (quoting *State v. Weems*, 429 Md. 329, 337 (2012)), *cert. denied*, 448 Md. 724 (2016). In this regard, we apply well-settled rules:

> We begin the statutory interpretation process by looking to the plain language of a statute, giving the words their natural and ordinary meaning. *Breslin* [*v. Powell*], 421 Md. [266,] 286 [(2011)] (citing *State Dep't of Assessments and Tax'n v. Md.-Nat'l Capital Park & Planning Comm'n*, 348 Md. 2, 13 (1997)). To determine the plain meaning of language, we consider the statutory scheme in which the particular provision or provisions appear. *State v. Pagano*, 341 Md. 129, 133 (1996) (citing *Kaczorowski v. Mayor of Balt.*, 309 Md. 505, 514 (1987)) ("[The meaning of the plain language] is controlled by the context in which it appears."). If the language is clear and unambiguous on its face, our inquiry ends. *Id.* (citing *Marriot Emps. Fed. Credit Union v. MVA*, 346 Md. 437 (1997)).

*Polek v. J.P. Morgan Chase Bank*, 424 Md. 333, 351 (2012) (parallel citations omitted).

The parties do not cite, and we have not found, any Maryland appellate court case specifically analyzing the argument that a court must consider a child's competency to testify prior to admitting an out-of-court statement pursuant to CP § 11-304. Other courts, however, have addressed the issue and rejected this argument.

22

In *Commonwealth v. Walter*, 93 A.3d 442, 451 (Pa. 2014), the Supreme Court of Pennsylvania held that a competency determination is not a prerequisite to the admission of hearsay statements under Pennsylvania's tender years statute, noting that there was no such requirement listed in the statute. Moreover, the court explained the differences between the concerns underlying the requirement that a child is competent to testify and the concerns implicated by the admissibility of a child's out-of-court statements under the tender years statute. *Id.* at 452. One of the primary concerns addressed by the requirement that a child witness be competent to testify is "a child's ability to perceive and remember events about which the child later testifies." *Id.* In determining whether out-of-court statements of a child contain particularized guarantees of trustworthiness, by contrast, the court looks to the circumstances under which the statements were made and focuses on the truthfulness of the statement, which is assessed by considering the factors set forth in the statute. *Id.* at 452-53. Accordingly, the court held "that a child need not be deemed competent to testify as a witness in order for the trial court to admit the child's out-of-court statements into evidence pursuant to the [tender years statute]." *Id.* at 453. *See also State v. Silverman*, 906 N.E.2d 427, 432 (Ohio 2009) (rule providing exception to child hearsay statements does not require competency finding); *State v. C.J.*, 63 P.3d 765, 770 (Wash. 2003) (en banc) (child hearsay exception statute does not contain "any requirement that a declarant must be shown to have possessed testimonial competency at the time of the out of court statement").

We reach the same conclusion with respect to Maryland's tender years statute. CP § 11-304 imposes multiple conditions that must be satisfied prior to the admission into

23

evidence of an out-of-court statement of a child under the age of 13. The statute, however, does not contain any requirement that the court first conduct a preliminary competency determination. In the absence of such a provision, this Court cannot read this requirement into the statute. *See State v. Adams-Bey*, 449 Md. 690, 702 (2016) ("'We neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning.'") (quoting *Bost v. State*, 406 Md. 341, 350 (2008)). Rather, pursuant to the plain language of CP § 11-304, a competency determination is not a component of the analysis required prior to admitting a child victim's out-of-court statement. Given the plain language of CP § 11-304, as well as the different concerns regarding the competency of a child witness to testify and the admissibility of a prior out-of-court statement by an abused child, we hold that a court need not make a competency determination prior to admitting a prior statement pursuant to CP § 11-304.

### 2.

### Statutory Factors

We thus turn to review whether the court's ruling complied with the requirements of CP § 11-304. It clearly did.

At the conclusion of the hearing, the court first found that there was "corroborative evidence that the alleged offender had the opportunity to commit the alleged abuse or

24

neglect." *See* CP § 11-304(d)(2)(ii).  This finding is not challenged; Mr. J. admitted that he and J.J. were living together at the time of the alleged abuse.

The court then addressed each of the 13 statutory factors to be considered in determining whether there were particularized guarantees of trustworthiness, as follows:

**[(i) the child victim's personal knowledge of the event]**

The child has great personal knowledge of the event.  She talks about it in detail about – there is no confusion about what happened in the statement.

**[(ii) the certainty that the statement was made]**

It was clearly made.  It was tape-recorded.  We all heard it.

**[(iii) any apparent motive to fabricate or exhibit partiality by the child victim, including interest, bias, corruption, or coercion]**

[S]he, in 2013, I think a little more than a year and a half before this incident made the statements about her father and wanted to get the gun and shoot him.

And in addition, there was testimony that the recurrence of this occurs that she may [have been] coerce[d] somewhat by her maternal relatives.  So there does exist an apparent motive to exhibit partiality by the child, and there was some testimony about possibility of coercion, although nothing specific under that factor.

**[(iv) whether the statement was spontaneous or directly responsive to questions]**

There was some spontaneity in the answers.  Most of them were directly responsive to questions.

**[(v) the timing of the statement]**

The timing of the statement is very proximate to the most recent abuse which was the night before.  So at least with regard to that, it's very proximate.  And then if you go back to Tuesday and Thursday, it was close in time to those, also.

25

**[(vi) whether the child victim's young age makes it unlikely that the child victim fabricated the statement that represents a graphic, detailed account beyond the child victim's expected knowledge and experience]**

Well, she is 9 years old now, right? Am I right?

And what she described would be beyond the child victim's expected knowledge and experience except for, unfortunately, for this child victim, she is a prior victim of sex abuse. So she may have and in all likelihood does have much more knowledge and experience. So it was an age appropriate statement for a 9-year-old in the sense of, I mean, it was a believable statement in the sense that she wouldn't have that knowledge. We don't know how much knowledge she has if any as a result of having been sexually abused before.

Now, I will talk more about how I'm evaluating that factor when I make my final ruling.

**[(vii) the appropriateness of the terminology of the statement to the child victim's age]**

It was completely appropriate using the terms of wee wee and private parts.

**(viii) the nature and duration of the abuse or neglect)**

She talked about the three specific days that she said. And then she said Tuesday and last night, but also that it started, I think it was three weeks after she went to see Miss Christine I think we figured out.

**[(ix) the inner consistency and coherence of the statement]**

There are things that are inconsistent in this statement. First, there's no clothes on. Then there's clothes on. Where she is during this? But when I look at, and then what happened?

\*\*\*

She is not being led in that part, and she is giving it graphically. Then she draws a picture – I mean, she writes a note about the suck. And uses her finger to go in and out of her mouth, I believe, later on when we get through there.

26

So there is nothing about that that is inconsistent or incoherent. And those are the two – the discussion of the actual events or whatever – the meat of the statement.

### [(x) whether the child victim was suffering pain or distress when making the statement]

She was, obviously – according to the testimony of Ms. Gattis in some distress, the stress not inconsistent with a 9-year-old making those statements.

### [(xi) whether extrinsic evidence exists to show the defendant or child respondent had an opportunity to commit the act complained of in the child victim's statement]

In the child victim's statement, there is extrinsic evidence. How convinced the trier of fact will be in light of other evidence does negate the fact that there is extrinsic evidence, and that is his statement against interest to [the Department] and/or the law enforcement officer. I don't know who he made that to exactly, the fact that they all live together in that house. And I don't know what other evidence will come in at trial. But there is extrinsic evidence.

### [(xii) whether the statement was suggested by the use of leading questions]

There were a lot of leading questions in here. I'm not sure with the social work background that Ms. Gattis has the same understanding of what a leading question is as people with a legal background. But as I was just reading through that part, which I call the meat of the statement, those weren't leading.

\*\*\*

I do not find that the salient parts of this statement were suggestive by the use of leading questions.

### [(xiii) the credibility of the person testifying about the statement)

Ms. Gattis was a credible witness. I didn't – I mean, it looked to me – I mean, from my evaluation, she was trying just to evaluate this statement. She did know in the back of her mind that there had been earlier allegations. But I don't find that that influenced the way she conducted the interview.

Now, whether that had any influence with their finding of indicated or – I don't know. But that's not for me to decide here and now.

After considering all these factors, the court, pursuant to the statute, made its ultimate decision on the admissibility of the statement. It ruled:

So I find that there are particularized guarantees of trustworthiness, and so I will determine that the statement is admissible as far as the statute goes. But, again, I think it's unclear to me whether at trial, additional evidence on the issue of opportunity might become relevant, but at this point I find it to be admissible.

As the above illustrates, the court did what it was required to do by specifically addressing the 13 factors as set forth in CP § 11-304. After doing that, it found that J.J.'s statement possessed "particularized guarantees of trustworthiness." Although Mr. J. may disagree with the court's findings, we are not persuaded that they were clearly erroneous.

## C.

## Notice

Ms. B. asserts that the court erred in failing to require the Department to follow the notice requirement of CP § 11-304(d)(3), which required the Department to provide notice of its intent to introduce J.J.'s out-of-court statement within a reasonable time before the proceeding. The Department and the children disagree. They assert that the statute requires only that notice of the statement be provided to the parties "within a reasonable time before the juvenile court proceeding," and the court properly concluded that the parties and their counsel had advance knowledge of the statements and were not prejudiced by proceeding.

CP 11-304(d)(3) requires that the State give notice of the intent to introduce a child's out-of-court statement "within a reasonable time before the juvenile court proceedings."

28

In this case, the Department filed a CP § 11-304 notice of intent to introduce J.J.'s out-of-court statement on September 28, 2015, attaching a transcript of Ms. Gattis' August 31, 2015 forensic interview of J.J. An adjudicatory and disposition hearing was scheduled for October 7, 2015. On October 6, 2015, the Department filed a motion to postpone the adjudicatory and disposition hearing because counsel discovered that she previously had represented Mr. J. Both parents consented to the postponement, and the CP § 11-304 hearing was scheduled for October 28, 2015, with the adjudication hearing postponed until November 18, 2015. At the October 7 postponement hearing, the Department also provided "to all counsel" the audio tape of the forensic interview, "which is part of the line which was filed by the Department on September 28th, which coincides with the transcription that was previously provided to counsel pursuant to that line." All counsel agreed that they had received the transcript and the audio tape.

The proceedings again were postponed, and the CP § 11-304 hearing took place on November 30, 2015. At the start of the hearing, counsel for Mr. J. noted an objection, stating that, although CP § 11-304 requires the attorney for the prosecution to "serve on the defendant child responder or alleged offender and the attorney for the defendant within a reasonable time," the State's intention to introduce a statement and the audio recording of the statement was served only on counsel, not Mr. J.

After counsel for Ms. B. stated that she had the same argument, the court noted that both parties had been present in court for a status conference two weeks earlier, where "[w]e had a great long discussion about this very matter." The court stated: "I find zero, and I mean zero prejudice to either of these parties as a result of that failure. Their counsel

were notified. We had an open court proceeding. . . . The notice wouldn't have told them anything they didn't already know. The motion is denied."

The hearing then proceeded. The audio tape was played for the court, and the official transcript of J.J.'s statement was admitted as an exhibit.

Ms. B. asserts that she was prejudiced because she "never waived her right to proper CP § 11-304 notice at the October 7, 2015 adjudicatory hearing," and "[h]ad the court not granted [the Department's] postponement of the adjudication for not timely discovering their counsel's conflict of interest," the Department "would not have been in compliance with CP 11-304 and the request to use the out of court statement of the child would have been denied." She argues that the Department's "untimely discovery of a conflict to negate the notice provisions of CP § 11-304 is not what the legislature intended."

Ms. B.'s argument is not persuasive. To warrant reversal in a civil case, an appellant must show both error and prejudice. *See Barksdale v. Wilkowsky*, 419 Md. 649, 660 (2011) ("[T]he burden to show error in civil cases is on the appealing party to show that an error caused prejudice."); *Flores v. Bell*, 398 Md. 27, 33 (2007) ("Prejudice can be demonstrated by showing that the error was likely to have affected the verdict below; an error that does not affect the outcome of the case is harmless error.").

Here, although the statute requires notice of the statement within a reasonable time before the CP § 11-304 proceeding, Ms. B. was provided with notice well in advance of the proceeding, and the circuit court properly found that any technical failure to comply with the notice required did not prejudice Ms. B. Ms. B. states no claim for relief in this regard.

## D.

### DNA Evidence

Ms. B. next argues that the court erred in failing "to compel discovery concerning DNA evidence." Specifically, she asserts that the court erred in failing to compel the Department to produce DNA evidence prior to the CP § 11-304 hearing.[11]

### 1.

### Proceedings Below

At the November 30, 2015, CP § 11-304 hearing, Mr. J.'s counsel objected to the hearing taking place, stating that it was "premature" because they were waiting for the results of the DNA analysis. Counsel asserted that Trooper Hale had been subpoenaed "due to her involvement in the investigation," stating that she "might perhaps be able to tell us what the status is of the results, if there were any preliminary results." Counsel for Ms. B. "note[d] the same objection," stating that the DNA results would be dispositive because "if they came back positive, then there would be no need for this hearing. If they came back negative, I believe that would be further support for the non-admissibility of the

---

[11] Ms. B. also discusses the court's refusal to order the Office of the State's Attorney to provide the DNA results at the adjudicatory hearing, but she cites no case holding that a court in a CINA case has authority to order the State's Attorney's Office to provide DNA evidence obtained in a criminal investigation, and she makes no specific argument that the court erred in this regard. Accordingly, to the extent that she is making an argument in this regard, we will not address it. *See Sutton v. FedFirst Fin. Corp.*, 226 Md. App. 46, 80 (2015) ("[W]e will not engage in a detailed analysis of [the] argument because the issue was not . . . adequately briefed on appeal."), *cert. denied*, 446 Md. 293 (2016); *Donati v. State*, 215 Md. App. 686, 743 ("Because appellant has not presented sufficient legal or factual argument for this Court to address this claim, we decline to consider it."), *cert. denied*, 438 Md. 143 (2014).

statements." The court stated that the DNA was not germane to the hearing, "[w]hich goes solely to the procedural issue of whether or the not the statement – the requirements for admissibility have been met." Noting that "we are working on a very statutorily mandated timeframe for these CINA cases," and "[t]he absence of DNA doesn't necessarily disprove abuse," the court overruled the objection.[12]

## 2.

### Ms. B.'s Discovery Request Was Not Applicable to CP § 11-304 Proceeding

Finally, Ms. B. asserts that the court "seemed to have no problem using the CINA timeframes as a sword against parents in their pursuit of a fair trial but ignored them for less important reasons such as potential conflicts." Ms. B. is wrong on all counts.

Ms. B. sets forth the rules relating to discovery and discovery violations in juvenile cases, the statute regarding time limits for the completion of joint investigations in child sexual abuse cases, and cites case law regarding constructive possession of records. She does not explain, however, how any of this is relevant to a CP § 11-304 proceeding.

As previously explained, the court in a CP § 11-304 proceeding is required to apply 13 statutory factors to make a determination whether a child's out-of-court statement has particularized guarantees of trustworthiness. The court properly applied the factors, and

---

[12] At the adjudicatory hearing, the Department stated that a final report existed, but it had received only the results. Counsel stated that the Department did "not intend to present any DNA evidence or even touch the issue," as it "consider[ed] it kind of a wash." Counsel for Mr. J. requested that the court order the Office of the State's Attorney, to produce the records, but the court stated that it did not know of any authority that permitted it to order an entity not a party to produce records. As indicated, we will confine our analysis to the argument specifically presented in the brief, which concerns the CP § 11-304 hearing.

found that the statement did possess particularized guarantees of trustworthiness. Under the facts of this case, DNA test results were not relevant to whether J.J.'s prior out-of-court statements to Ms. Gattis was sufficiently trustworthy to be admissible.[13] The circuit court did not err in denying the request for DNA evidence prior to the CP § 11-304 proceeding.

**E.**

**Quashed Subpoena**

Mr. J. contends that "the court erred by quashing the subpoena for Trooper Hale." Although he now states that he could have examined Trooper Hale about her observation of J.J.'s demeanor, he did not make this argument below, and therefore, it is not preserved for appellate review. *See White v. State*, 324 Md. 626, 640 (1991) (argument not made to the trial court is not properly before the appellate court); *Leake v. Johnson*, 204 Md. App. 387, 406 (2012) ("Ordinarily, an appellate court will not decide an issue 'unless it plainly appears by the record to have been raised in or decided by the trial court.'") (quoting *General Motors Corp. v. Seay*, 388 Md. 341, 362 (2005)).

Mr. J.'s argument below was that he wanted Trooper Hale to testify regarding preliminary results of DNA testing. The court, after concluding that the DNA evidence was not relevant to the CP § 11-304 proceedings, stated that Trooper Hale's testimony regarding the issue would not be helpful, and therefore, "the motion for the subpoena is quashed." As indicated, we agree that the DNA evidence was not relevant to the CP § 11-

---

[13] Indeed, as the circuit court noted, even at the adjudicatory hearing, evidence of the absence of DNA would not disprove abuse, particularly given that J.J. had showered and brushed her teeth prior to the SAFE exam.

304 hearing. Accordingly, the circuit court did not err in quashing the subpoena for Trooper Hale to testify at the hearing about the preliminary DNA results.

**F.**

**Examination of J.J.**

CP § 11-304(g) provides that, in determining whether a child's out-of-court statement had particularized guarantees of trustworthiness, the court "shall examine the child victim," except in certain circumstances, including where "the court determines that an audio or visual recording of the child victim's statement makes an examination of the child victim unnecessary." CP § 11-304(g)(1)(ii). Here, the circuit court decided not to interview J.J., stating "that the audio recording of the child makes an examination of the child victim unnecessary in this case. I don't think it would add to my ability to determine whether that statement made back [in August] in light of the questioning had particularized guarantees of trustworthiness."

Ms. B. contends that the court's failure to interview J.J. in person was "clearly an error and violation of CP § 11-304." We are not persuaded.

As the Department notes, Ms. B.'s assertion "is in direct conflict with the plain terms of the statute." The statute provides that if, as here, an audio recording of a child's statement exists, the court is not required to conduct an in-chambers examination. Ms. B.'s contention in this regard is without merit.

34

## G.

## Cross-Examination of Department's Social Worker

Ms. B. asserts that the court erred in denying her the right to cross-examine the Department's social worker, Ms. Gattis, regarding J.J.'s statements, listing four specific occasions. The Department and the children contend that the court properly sustained the objections because the area of questioning went to the weight to be given the statement, not its admissibility pursuant to CP § 11-304, and the proper forum to impeach J.J.'s statement was the adjudication hearing, at which time appellants were able to cross-examine Ms. Gattis.

"Control over the scope of cross-examination has traditionally been left to the discretion of the trial court." *B.H. v. Anne Arundel Cty. Dep't of Soc. Servs.*, 209 Md. App. 206, 221 (2012) (quoting *Comm'n on Med. Discipline v. Stillman*, 291 Md. 390, 422 (1981)). Trial judges have "'wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues . . . or interrogation that is . . . only marginally relevant.'" *Smallwood v. State*, 320 Md. 300, 307 (1990) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). We generally do not disturb a trial court's evidentiary ruling, unless there has been an abuse of the court's broad discretion. *Churchfield v. State*, 137 Md. App. 668, 682, *cert. denied*, 364 Md. 536 (2001). "An abuse of discretion occurs 'where no reasonable person would take the view adopted by the [trial] court,' or when the court acts 'without reference to any guiding rules or principles.'" *Hajireen v. State*, 203 Md. App.

537, 552 (quoting *Brass Metal Prods. v. E-J Enters.*, 189 Md. App. 310, 364 (2009)), *cert. denied*, 429 Md. 306 (2012).

Here, at the CP § 11-304 hearing, counsel for Ms. B. was permitted to cross-examine Ms. Gattis. We will address, in turn, each of the four instances in which she alleges that the court improperly restricted cross-examination.

Ms. B. first contends that she "was not permitted to question [Ms. Gattis] about prior inconsistent statements made by [J.J.] to other medical professionals." She asserts that these prior inconsistent statements went to J.J.'s "trustworthiness and [were] required to be considered by the trial court when deciding whether to admit [her] audio taped hearsay statement to the social worker." At the hearing, counsel for Ms. B. asked Ms. Gattis about the report of Dr. Jennifer Wehberg, the doctor who had conducted a second SAFE examination on J.J., and to whom J.J. had given another statement. Counsel noted that she was referring to Dr. Wehberg's report because J.J.'s statement to Dr. Wehberg was a "slightly different version." The Department objected, stating that the proceeding was to assess the admissibility of J.J.'s statement to Ms. Gattis, and Ms. B. was seeking to introduce other alleged inconsistent statements for impeachment purposes, which was appropriate for the CINA adjudication proceeding, not "the 11-304 analysis." When the court asked counsel for Ms. B. how these other statements would be relevant to the § 11-304 factors, counsel stated that they were relevant to the factors of "[t]he inner consistency and coherence of the statement" and the "[t]he timing of the statement." The court disagreed and sustained the Department's objection.

On appeal, Ms. B., for good reason, does not argue that the statements to another doctor were relevant to the "inner consistency" of J.J.'s statement to Ms. Gattis or the timing of the statement. Rather, she merely states, without explanation, that this other statement went to J.J.'s trustworthiness. We are not persuaded, and we perceive no abuse of discretion by the circuit court in precluding cross-examination in this regard.

The second area in which Ms. B. asserts that the court improperly denied cross-examination involved "prior unsubstantiated allegations of sexual abuse." In particular, counsel for Ms. B. questioned Ms. Gattis about a 2014 sexual abuse allegation made by J.J. against Mr. J. After Ms. Gattis testified, based on her reading of a document, that J.J. previously "disclosed that her father instructed her to lay on the bed, and then he licked her yorkie," referring to her vagina, the Department objected to the relevance of this line of questioning. Counsel for Ms. B. stated that it was relevant to the factor of age appropriateness, stating: "[I]t talks about the appropriateness of the terminology of the statement to the child victim's age, whether the child victim's young age makes it unlikely that the child victim fabricated the statements that represents a graphic detail account beyond the child victim's expected knowledge and experience." Counsel also stated that it went to "her truthfulness that there were two prior allegations against Dad which were unsubstantiated." The court stated that ""the real question is whether or not this interview

37

was conducted appropriately, and there is guarantees of trustworthiness in light of the questioning and responses in this interview," and it sustained the objection.

Ms. B. contends that testimony about prior allegations of sexual abuse that the Department found unsubstantiated "goes generally to the child's trustworthiness."[14] Whether the Department found corroboration of her prior allegations, however, does not bear on the issue presented at the CP § 11-304 hearing, i.e., whether J.J.'s statements on August 30, 2015, had guarantees of trustworthiness. To make that determination, the circuit court properly looked, pursuant to the statute, to the circumstances surrounding the giving of that statement and the content of the statement itself.

Ms. B.'s third assertion of error involves counsel's question whether Ms. Gattis had "any discussions with [J.J.] after August 30th about anything of a sexual nature." Ms. Gattis responded in the affirmative, and the court sustained the Department's objection. Ms. B. asserts that this testimony was required to assess the appropriateness of the terminology of the statement to J.J.'s age, or whether the statement represented a graphic detailed account beyond the child victim's experience and knowledge. It is unclear to us how discussions *after* August 30, the date the statement was made, would be relevant to the trustworthiness of the statement.

Ms. B.'s final contention involves counsel's attempt to cross-examine Ms. Gattis regarding J.J.'s prior statement to an officer at the Fruitland Police Department before she

---

[14] Ms. B. also argues that it was relevant to show that J.J. had a motive to fabricate the allegations against Mr. J. This argument was not made below, and therefore it is not preserved for appellate review. *See White v. State*, 324 Md. 626, 640 (1991); Md. Rule 8-131.

38

was taken to the emergency room. The Department again objected on the ground that this was an attempt to use extraneous statements to impeach the statement, which would be relevant at the adjudicatory proceeding, but not at the CP § 11-304 hearing. The court sustained the objection. Ms. B. asserts that this ruling was erroneous because the evidence "would have shown additional inconsistent statements made by [J.J.] to the" police. As with the statement to Dr. Wehberg, J.J.'s statement to police was not relevant to the CP § 11-304 hearing. The circuit court did not err in sustaining the objection to this question. Rather, it properly exercised its discretion in controlling the scope of cross-examination during the CP § 11-304 hearing.

## II.

### CINA Adjudication

Mr. J. and Ms. B. contend that the court's CINA finding was clearly erroneous, for several reasons. They both argue that the court erred in concluding that Mr. J. had sexually abused J.J., asserting that J.J.'s statements were unreliable and insufficient to sustain a CINA finding. Ms. B. further argues that the court erred in finding that she was unable to give proper care and attention to J.J., suggesting that the position she took at the hearing, that it was not clear that J.J. was abused by her father, was supported by the evidence. Ms. B. asserts that, because she no longer was incarcerated at the time of the disposition hearing, wanted the children returned to her, had not abused or neglected them, and was willing to abide by Department recommendations, the court should not have "taken the drastic measure of removing both of the children from her care and committing them to" the Department.

39

The Department and the children contend that the court properly exercised its discretion in finding that the children were CINA. They note that the court found that Mr. J. sexually abused J.J., which created a substantial risk of harm to both J.J. and D.J., and the court also considered Mr. J.'s and Ms. B.'s "long histories of neglect," which provided an "ample evidentiary basis" to declare the children CINA.

Allegations in support of a CINA petition must be proven by a preponderance of the evidence. *In re Nathaniel A.*, 160 Md. App. 581, 595, *cert. denied*, 386 Md. 181 (2005); Md. Code (2011 Supp.) § 3-817(c) of the Courts & Judicial Proceedings Article ("CJP"). When this Court reviews a CINA finding, we assess whether the circuit court's factual findings are clearly erroneous and whether the court applied the correct legal standards. *In re Shirley B.*, 419 Md. 1, 18 (2011). "[W]hen the appellate court views the ultimate conclusion of the [circuit court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [circuit court's] decision should be disturbed only if there has been a clear abuse of discretion." *In re Yve S.*, 373 Md. 551, 586 (2003) (emphasis added). A decision will be reversed for an abuse of discretion only if it is "'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Id.* at 583-84 (quoting *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312 (1997)).

As indicated, a child is determined to be a CINA upon a finding by the court that the child "is in need of judicial intervention because he or she has been abused or neglected, and whose parents or guardian either cannot or will not adequately care for the child." CJP § 3-801(f). Abuse includes "[p]hysical or mental injury of a child under circumstances that

40

indicate that the child's health or welfare is harmed or is at substantial risk of being harmed," including sexual abuse. CJP § 3-801(b)(2). Neglect is defined as failure to "give proper attention to a child," placing the child at "substantial risk of harm." CJP § 3-801(s). In evaluating whether such a risk exists, the court has "a right – and indeed a duty – to look at the track record, the past, of [a parent] in order to predict what her future treatment of the child may be." *In re Dustin T.*, 93 Md. App. 726, 735 (1992), *cert. denied*, 329 Md. 480 (1993). That track record includes evidence that the parent has neglected the child's sibling. *See William B.*, 73 Md. App. 68, 77 (1987) ("The parents' ability to care for the needs of one child is probative of their ability to care for other children in the family."), *cert. denied*, 311 Md. 719 (1988).

Here, the court found that Mr. J. abused J.J. by "rubb[ing] his penis on her body and ha[ving] her suck his penis." It also found that both parents had "extensive histories of being unable to properly care for the children." As set forth in detail, *supra*, these findings were supported by the evidence presented. The court did not err in finding the children to be CINA.

### III.

### Suspension of Mr. J.'s Visitation

Mr. J. next challenges the court's order denying him all visitation with the children. He contends that this order, which he asserts was based on the Department's complaints about his conduct during visits, was "overly sweeping, and thus it was an abuse of discretion." In support, Mr. J. argues that the finding that he sexually abused J.J. "in and of itself does not justify the complete denial of contact, particularly" with respect to D.J.,

41

and he "should have been permitted to have some form of visitation – supervised visits, telephone calls, or Skype visits – with at least [D.J.], if not both children."

During oral argument, counsel for the parties agreed that, at that time, Mr. J.'s visitation with D.J. had resumed, and the issue of visitation with D.J., is moot. We agree. *See Frazier v. Castle Ford, Ltd.*, 430 Md. 144, 162 (2013) (an issue "is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy that the court can provide"). *See also In re Prince S.*, 355 Md. 227, 230 (1999) (holding that appeal was moot where "[t]here is no effective relief that this Court could provide to appellant, even if we were to agree with her position").

With respect to J.J., however, Mr. J. argues that the issue is not moot because Mr. J.'s visitation is still suspended. We will consider this issue on the merits.

In determining visitation, the trial court is required to consider the best interests of the child, and therefore, visitation may be restricted or denied when the child's health or welfare is threatened. *In re Yve S.*, 373 Md. at 566-67. "Where the child has been declared a child in need of assistance because of abuse or neglect, the trial court is constrained further by the requirements of" Md. Code (2015 Supp.) § 9-101 of the Family Law Article ("FL"). *In re Billy W.*, 387 Md. 405, 447 (2005). This statute provides:

> (a) *Determination by court.* — In any custody or visitation proceeding, if the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.
> (b) *Specific finding required.* — Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, the court

42

shall deny custody or visitation rights to that party, except that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.

FL § 9-101. We review a circuit court decision on visitation for an abuse of discretion. *In re: Mark M.*, 365 Md. 687, 704 (2001).

Here, the court had before it testimony indicating that J.J. had been sexually abused by Mr. J., and the court did not specifically find that "there was no likelihood of further abuse." There was evidence that J.J. did not want to have contact with Mr. J., and J.J.'s trauma therapist was "supportive" of this request. Under these circumstances, the court did not abuse its discretion in ordering that Mr. J. not have visitation with J.J.

## IV.

## Extension of Shelter Care

Ms. B. asserts that the court violated the provisions of the Maryland Rules by extending shelter care and continuing to postpone adjudication beyond the time limits proscribed by those rules. The Department contends that Mr. J. and Ms. B. waived the timeframes provided in the rules, and the court properly exercised its broad discretion to keep the children safe during the review of the "serious abuse allegations."

## A.

## Shelter Care

Maryland Code (2015 Supp.) § 3-815(d) of the Courts and Judicial Proceedings Article provides that, after a child is placed in shelter care, the court may continue shelter care beyond emergency shelter care only if the court finds that:

43

(1) Return of the child to the child's home is contrary to the safety and welfare of the child; and

(2)(i) Removal of the child from the child's home is necessary due to an alleged emergency situation and in order to provide for the safety of the child; or

(ii) Reasonable efforts were made but were unsuccessful in preventing or eliminating the need for removal of the child from the home.

Maryland Rule 11-112(b) provides:

1. Finding. Detention or shelter care may not be continued beyond emergency detention or shelter care unless after a hearing the court finds that one or more of the circumstances stated in Section 3-815(b) of the Courts Article exists.

2. Maximum Period of Detention or Shelter Care. Continued detention or shelter care pending the adjudicatory or waiver hearing may not be ordered for a period of more than thirty days.

Maryland Rule 11-114(a) and (b) provide, in relevant part, as follows:

**Adjudicatory hearing.**
a. **Requirement.** After a juvenile petition has been filed . . . the court shall hold an adjudicatory hearing.

b. **Scheduling of hearing.** 1. Adjudicatory hearing. An adjudicatory hearing shall be held within sixty days after the juvenile petition is served on the respondent . . . . However, upon motion made on the record within these time limits by the petitioner or the respondent, the administrative judge of the county or a judge designated by him, for extraordinary cause shown, may extend the time within which the adjudicatory hearing may be held. The judge shall state on the record the cause which requires an extension and specify the number of days of the extension.

2. **Prehearing . . . shelter care.** If the respondent is in . . . shelter care, the adjudicatory hearing shall be held within thirty days from the date on which the court ordered continued detention or shelter care. If an adjudicatory hearing is not held within thirty days, the respondent shall be released on the conditions imposed by the court pending an adjudicatory hearing which hearing shall be held within the time limits set forth in subsection 1 of this section.

## Proceedings Below

Here, shelter care was granted on September 2, 2015, by agreement of the parties. The parents consented to an extension of shelter care to obtain discovery, and the adjudicatory hearing was set for October 7, 2015.

On October 7, 2015, the Department's counsel informed the court that she had a conflict because she had discovered that Mr. J. was a former client, and Mr. J. declined to proceed with her as counsel for the Department. Both Mr. J. and Ms. B. agreed to continue shelter care until the adjudicatory hearing. The court found extraordinary circumstances to postpone the adjudicatory hearing until November 18, 2015, and it continued shelter care for the children.

On October 28, 2015, the scheduled date for the CP § 11-304 hearing, Mr. J.'s new attorney disclosed a conflict, stating that his daughter was one of J.J.'s teachers. Although Mr. J. stated that he did not have an issue with his attorney's representation of him, counsel for Ms. B. proffered that, although the case could move forward, it would be "more fair" to Mr. J. if he had the same counsel represent him throughout the CP §11-304 and adjudication proceedings. The court stated that Mr. J.'s interests would be best served if he had the "same lawyer handle the motion as handles the trial," and counsel for the parents indicated that, although the parents were upset about the delay, there did not seem to be another solution. The court noted that the time deadline for the adjudicatory hearing had already been waived by the parents, and it further found extraordinary cause to continue the case. The court additionally found "extraordinary cause" to continue the children in

shelter care, stating that it was "contrary to their welfare to return home at this time for the same reasons set out in the previous Shelter Care Order." The court then scheduled the CP § 11-304 hearing for November 30, 2015, and the adjudication hearing for December 16, 2015. The court also scheduled a status conference for November 18, 2015.

At the status conference, Ms. B., who was still incarcerated, but "adamant" that she was going to be released "on Friday," was represented by counsel, who requested that the children be returned to Ms. B.'s care. Both parents objected to continued shelter care, but the court continued the shelter care order until the scheduled adjudicatory hearing in December.

## C.

### Analysis

Although Ms. B. contends on appeal that the court erred in continuing "shelter care beyond the 30 day limit," the record reflects that Ms. B. consented to postponements of the adjudicatory hearing, and the continuation of shelter care until that time, on several occasions. It was not until the November 18, 2015, status conference, after the adjudicatory hearing had already been moved to December 16, 2015, and while Ms. B. still was in jail, that she objected to continued shelter care for the children.

We are inclined to agree with the Department that Ms. B., by consenting to continued shelter care, waived the right to insist on the time requirements for placement in shelter care, and that the court properly exercised its discretion to keep the children in shelter care for their own safety. We need not, however, address Ms. B.'s contention regarding the propriety of the continuation of placement in shelter care because the issue

46

has been rendered moot by the court's subsequent order finding the children to be CINA and committing them to the care of the Department for placement.

As indicated, an issue, "is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy that the court can provide." *Frazier*, 430 Md. at 162. Here, even if, arguendo, we determined that the court erred in extending the children's placement in shelter care, the Department would still retain custody of the children pursuant to the court's findings at the disposition hearing. Thus, there is no relief that this Court can provide to Ms. B. The issue raised regarding violation of the time requirements for shelter care is moot, and we will not address it.[15]

> **JUDGMENTS OF THE CIRCUIT CORUT FOR WICOMICO COUNTY AFFIRMED. COSTS TO BE PAID 50% BY APPELLANT MOTHER, AND 50% BY APPELLANT FATHER.**

---

[15] We recognize that a court may consider a moot issue if it presents a matter of manifest urgency and important public concern. *See Armstrong v. Bd. of Mun. & Zoning Appeals*, 169 Md. App. 736 (2006) ("A court may decide a moot question where there is an imperative and manifest urgency to establish a rule of future conduct to matters of important public concern which may frequently consider, and because of time constraints unable to afford appellate review."). *Accord Attorney General v. Anne Arundel County School Bus Contractors Ass'n*, 286 Md. 324, 328 (1979); *State v. Ficker*, 266 Md. 500, 507 (1972). Ms. B. did not argue, and we are not persuaded, that this is such a case, particularly where Ms. B. consented to multiple postponements.