*In re: J.J. and T.S.*, No. 5, September Term, 2017

**APPELLATE REVIEW — PRESERVATION — MD. RULE 8-131 — EXERCISE OF APPELLATE COURT'S DISCRETION TO ADDRESS CLAIMS NOT PROPERLY PRESERVED FOR APPELLATE REVIEW** — Petitioner Mr. J. did not preserve for appellate review the question of whether a juvenile court must make a preliminary competency determination prior to ruling on the admissibility for the truth of the matter asserted of a non-testifying child declarant's out-of-court statement. The Court of Appeals exercised its discretion to consider the unpreserved question.

**FAMILY LAW — COMPETENCY —** The plain language and legislative history of Maryland Code Annotated, Criminal Procedure § 11-304 does not require a juvenile court to make a preliminary competency determination prior to ruling on the admissibility for the truth of the matter asserted of a non-testifying child declarant's out-of-court statement. Such a determination is also irrelevant to a juvenile court's ruling on whether the statement contains "particularized guarantees of trustworthiness" to be admissible under the statute.

**FAMILY LAW — ADMISSIBILITY UNDER CRIMINAL PROCEDURE § 11-304, THE "TENDER YEARS EXCEPTION" —** The juvenile court did not err in concluding that the child declarant's out-of-court statement was admissible for the truth of the matter asserted in a juvenile court proceeding because the statement contained "particularized guarantees of trustworthiness" as required under Maryland Code Annotated, Criminal Procedure § 11-304.

Circuit Court for Wicomico County
Case Nos. 22-I-15-000008; 22-I-15-000009
Argued: September 7, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 5

September Term, 2017

_____

IN RE: J.J. AND T.S.

_____

Barbera, C.J.,
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by Barbera, C.J.

_____

Filed: November 28, 2017

Out-of-court statements offered for the truth of the matter asserted are generally inadmissible as hearsay unless otherwise permitted by statute or rule. One such statutory exception, known as the "tender years exception," is found at § 11-304 of the Criminal Procedure ("CP") Article of the Maryland Code. Section 11-304 applies to criminal cases and juvenile court proceedings, including child in need of assistance ("CINA") proceedings.[1] That section further provides that a child's out-of-court statement is admissible to prove the matter asserted "only if" the statement has "particularized guarantees of trustworthiness." CP § 11-304(e)(1). In making that determination, the court "shall consider, but is not limited to" thirteen factors listed in the statute. CP § 11-304(e)(2).

We address in the present case the admissibility at a CINA proceeding of the out-of-court statement of J.J., the then-nine-year-old daughter of Petitioner James J. ("Mr. J."), alleging that Mr. J. had sexually abused her. The Wicomico County Department of Social Services sought to introduce J.J.'s statement to prove the truth of the matter asserted at the CINA adjudication and disposition hearings involving J.J. and her brother, T.S. The Circuit Court for Wicomico County, sitting as a juvenile court, determined that J.J.'s statement would be admissible to prove the truth of the matter asserted because the statement possessed the requisite particularized guarantees of trustworthiness.

The Court of Special Appeals affirmed the judgment of the juvenile court. *In re:*

---

[1] A "child in need of assistance" ("CINA") is a child who requires court intervention because the child has been neglected or abused and whose parents or guardians are "unable or unwilling to give proper care and attention to the child and the child's needs." Md. Code Ann., Courts & Judicial Proceedings, § 3-801(f).

*J.J. and T.S.*, 231 Md. App. 304, 311 (2016). In an apparent exercise of its discretion, the intermediate appellate court first addressed Mr. J.'s argument, raised for the first time on appeal, that the juvenile court should have ruled on J.J.'s competence to distinguish between truth and falsehood before determining whether her out-of-court statement was admissible under CP § 11-304. *Id*. at 327–31. The intermediate appellate court concluded that CP § 11-304 does not require a juvenile court to determine a child's truth competency when ruling on the admissibility of the child's out-of-court statement. *Id*. at 331. The court then held that the juvenile court complied with the requirements of CP § 11-304 in concluding that J.J.'s statement possessed particularized guarantees of trustworthiness. *Id*. at 335.

We similarly exercise our discretion to address the unpreserved competency issue, and, like the Court of Special Appeals, hold that competency is not a prerequisite to admission of a child's out-of-court statement for the truth of the matter asserted under CP § 11-304. We also agree with the Court of Special Appeals that the juvenile court did not err in finding that J.J.'s out-of-court statement possessed the requisite particularized guarantees of trustworthiness required for admissibility under that section. Accordingly, we affirm the judgment of the Court of Special Appeals.

## I.

### The Statute

We begin with a more detailed overview of CP § 11-304. That section prescribes the conditions under which a child's out-of-court statement is admissible to prove the truth of the matter asserted in a juvenile court proceeding. As a threshold matter, the statement

must be made by a child victim who is under thirteen years old and "is the alleged victim or the child alleged to need assistance in the case before the court concerning . . . a juvenile court proceeding[.]" CP § 11-304(b). Next, the statement must be "made to" and "offered by a person [who is] acting lawfully in the course of" certain professions, including, as relevant here, a social worker, when the statement was made. CP § 11-304(c).

The statement may be admitted in a CINA proceeding pursuant to the statute "if the statement is not admissible under any other hearsay exception" and "regardless of whether the child victim testifies." CP § 11-304(d)(2)(i). If the child victim does not testify, the statement "will be admissible only if there is corroborative evidence that the alleged offender had the opportunity to commit the alleged abuse or neglect." CP § 11-304(d)(2)(ii).

As noted above, to be admissible, the statement must also have "particularized guarantees of trustworthiness." CP § 11-304(e)(1). When determining whether the statement has such guarantees, the juvenile court "shall consider, but is not limited to," the following thirteen factors:

> (i) the child victim's personal knowledge of the event;
>
> (ii) the certainty that the statement was made;
>
> (iii) any apparent motive to fabricate or exhibit partiality by the child victim, including interest, bias, corruption, or coercion;
>
> (iv) whether the statement was spontaneous or directly responsive to questions;
>
> (v) the timing of the statement;

(vi) whether the child victim's young age makes it unlikely that the child victim fabricated the statement that represents a graphic, detailed account beyond the child victim's expected knowledge and experience;

(vii) the appropriateness of the terminology of the statement to the child victim's age;

(viii) the nature and duration of the abuse or neglect;

(ix) the inner consistency and coherence of the statement;

(x) whether the child victim was suffering pain or distress when making the statement;

(xi) whether extrinsic evidence exists to show the defendant or child respondent had an opportunity to commit the act complained of in the child victim's statement;

(xii) whether the statement was suggested by the use of leading questions; and

(xiii) the credibility of the person testifying about the statement.

CP § 11-304(e)(2).

Prior to the hearing at which the out-of-court statement is to be introduced, the court conducts a hearing at which the court must "make a finding on the record as to the specific guarantees of trustworthiness that are in the statement" and "determine the admissibility of the statement." CP § 11-304(f). Section 11-304(g)(1) directs the court to examine the child as part of its determination unless "the court determines that an audio or visual recording of the child victim's statement makes an examination of the child victim unnecessary."

We have said that a judge who is called upon to determine "the admissibility of a

4

tape recorded interview offered into evidence pursuant to [CP] § 11-304 . . . must comply with the foundational requirements of that statute, including the requirement that the court 'make a finding on the record as to the specific guarantees of trustworthiness that are in the statement[.]'" *Jones v. State*, 410 Md. 681, 699–700 (2009) (quoting CP § 11-304(f)(1)). The hearing at which that determination is made is generally referred to as the "§ 11-304 hearing." We shall employ that description here.

## II.

### The Present Case

A. *Factual Background*

The underlying facts relevant to this appeal are not extensive. J.J. was born in April 2006 and, as mentioned, was nine years old when she made the allegation of sexual abuse against her father, Mr. J. Her brother, T.S., born in December 2011, was three years old at the time of the allegation. J.J. and T.S. are the children of Petitioners, Mr. J. and Ms. B. The children were living alone with Mr. J. in August 2015 because Ms. B. was incarcerated. On August 30, 2015, during a visit with her maternal grandmother, J.J. told her grandmother that Mr. J. had sexually abused her twice in the prior week. Someone—the record does not disclose who—contacted the Fruitland Police Department on August 30, 2015, to report J.J.'s allegation that Mr. J. had sexually assaulted her. That same day, the Fruitland Police Department contacted Trooper Donna Hale of the Wicomico County Sheriff's Office about J.J.'s allegations. Sometime between 5:00 p.m. and 6:00 p.m. that afternoon, Tiffany Gattis, a licensed clinical social worker with the Child Advocacy Center, received a report of the allegation.

5

At 7:09 p.m. on August 30, Ms. Gattis conducted an audio-recorded forensic interview of J.J. in a treatment room at the Peninsula Regional Medical Center. The interview was audio-recorded because visual recording was unavailable due to the location of the interview. Trooper Hale was present when the interview was conducted. Ms. Gattis interviewed J.J. using a forensic interview method known as RATAC, an acronym for Rapport, Anatomy, Touch, Abuse, and Closure. RATAC is a guided, non-leading, standardized approach for interviewing children about alleged abuse. The interview lasted approximately twenty-one minutes and ended when J.J. asked to stop the interview.

Later on the evening of August 30, Ms. Gattis spoke with Mr. J. and T.S. at the police department. Mr. J. told Ms. Gattis that J.J. and T.S. had gone to visit their maternal family on Wednesday, August 25, and returned to his care on the evening of Saturday, August 29. Mr. J. denied abusing J.J., stating that "he would not consider fighting for his children because it was becoming an old and tiring process to be accused of sexual abuse." Mr. J. also told Ms. Gattis that J.J. was "starting [a] mess, again" and that "he should have never allowed her to visit . . . her family because they were filling her head with nonsense." Ms. Gattis also spoke with T.S., who was three years old at the time. No useful information was gathered because the information sought was beyond the scope of his age.

That same evening, a doctor at the Peninsula Regional Medical Center performed a Sexual Assault Forensic Exam ("SAFE") on J.J., but J.J. had brushed her teeth, showered, urinated, and defecated prior to the exam. The SAFE report documented that J.J. was observed to have a "notch" on her hymen and that she was "tender." The report also noted that "[J.J.] pointed to [a] penis sketch to say 'it went in me.'"

6

On August 31, 2015, the Department of Social Services ("Department") removed J.J. and T.S. from their home and placed them in shelter care. That day, after the children had been removed from their home, the Department filed a Petition for CINA. At the shelter care hearing on September 2, 2015, both parents agreed to shelter care, and an adjudication was scheduled. On September 3, 2015, a medical doctor conducted a Child Abuse Medical Providers ("CHAMP") exam and produced a report. The CHAMP report documented that J.J. stated, "[D]ad put his finger in me and made me suck his private part." Though the physical CHAMP exam "show[ed] no lacerations, scars, bruises, [and] no evidence of acute trauma," the examiner found that this "exam CAN be consistent with disclosure." (emphasis in original).

The Department filed an Amended CINA Petition on September 22, 2015, supplementing the Petition with allegations of neglect dating back to 2012.

B. *The Proceedings*

1. The § 11-304 Hearing

Pursuant to CP § 11-304(d)(3), the Department filed a notice of intent to introduce J.J.'s audio-recorded out-of-court statement to Ms. Gattis and, on November 30, 2015, the juvenile court conducted a hearing on its admissibility. Both parents were present and represented by counsel. J.J. and T.S., though not present at the hearing, were also represented by counsel. The court heard testimony from Ms. Gattis and Christine Whitworth, a Department in-home case worker assigned to Petitioners' family from December 2014 through and including August 2015. Mr. J. also testified.

Ms. Whitworth testified that Mr. J. lived alone with J.J. and T.S. on the days

7

immediately preceding the alleged sexual abuse. Although she could not confirm that Mr. J. remained alone with the children on the exact days of the alleged abuse, she saw no reason that Mr. J. would have discontinued his role as the sole caregiver.

Ms. Gattis's testimony focused on her interview of J.J. At the time of trial, Ms. Gattis had eight years of experience with the Department and had interviewed approximately 3500 children in her work with the Child Advocacy Center, though not exclusively for sexual abuse. She described J.J.'s demeanor during the interview. She stated that J.J. was initially "very pleasant," showing no signs of physical distress in the interview. When, however, the conversation turned to anatomy and abuse, J.J. became more "quiet and reserved," her "shoulders would cave in and her head dropped down," and "she withdrew from conversation." Ms. Gattis interpreted such changes as a "sign of distress." Ms. Gattis described J.J.'s allegations of sexual abuse by her father:

> [J.J.] was very specific during the forensic interview. She identified that her father forced her, and she identified as wee wee, adult or others would say penis. She identified that her father forced her to suck his wee wee. She also identified that her father rubbed his wee wee on her vagina at some point in time. . . . She was very specific to say that it occurred in the living room of their current home[.] . . . When asking about dates, [J.J.] referred to the incidents as occurring, she stated last night [August 29] and Tuesday [August 24]. . . . [J.J.] identified that it was herself, her father and her brother in the household.[2]

---

[2] Addressing the days of the week on which J.J. alleged the abuse to have occurred, Ms. Gattis stated:

> [J.J.] was able to say the night before and Tuesday. She has a concept of what days of the week. However, because of her age, and because it's a traumatic event, I would not hold her steadfast to saying Tuesday, Wednesday, Thursday, whatever

8

Ms. Gattis added that "[J.J.] made a very spontaneous comment regarding her brother. During the abuse scenario, [she] referred to her brother as upstairs in the bathtub making a whole bunch of noise. . . . Her brother was not around when the abuse occurred."

During Ms. Gattis's testimony, the audio recording of J.J.'s statement was played for the court. In the audio recording, J.J. described Mr. J. as getting "fully naked," after which he "pulled [her] pants off and pulled [her] shirt off," "got on top," "rubbed his wee wee" on her unclothed "private part," and made her "suck his wee wee." J.J. said that when the oral sex was over, she "threw up."

Ms. Gattis testified that, during the interview, J.J. used her hands to demonstrate to Ms. Gattis the size of Mr. J.'s penis, of which J.J. drew a picture that was consistent with what she demonstrated to Ms. Gattis. When Ms. Gattis asked J.J. if this had ever happened before, J.J. said, "Yeah, the last time I talked to you."[3]

---

day it may have been. However, she was able to be cognizant last night. She was able to say last night which doesn't require a day of the week.

[3] J.J. had alleged in January 2013 and again in October 2014 that Mr. J. had sexually abused her. Ms. Gattis met J.J. after the alleged October 2014 incident. The Department of Social Services investigated both of those allegations. Neither allegation was "ruled out"; however, both were determined to have been "unsubstantiated." *See* Md. Code Ann., Fam. Law § 5-701(m), (w), (aa) (providing three findings concerning alleged abuse and neglect: "indicated," "ruled out," and "unsubstantiated"). A finding of "unsubstantiated" means "a finding that there is an insufficient amount of evidence to support a finding of indicated or ruled out." § 5-701(aa).

J.J. made a separate allegation of sexual abuse by her maternal cousin in January 2013. Following that investigation, the local Department of Social Services found the cousin's sexual assault to have been "indicated," which is defined as "a finding that there is credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse did occur." § 5-701(m). Her cousin was ultimately criminally charged and

9

Ms. Gattis testified that J.J. demonstrated with a pen the act of "sucking a wee wee." Ms. Gattis added that this was "sexual knowledge" a nine-year-old should not have and that it was "grotesque . . . to see a child who is 9 years old perform what she is telling you." Ms. Gattis also described her August 30 interview with Mr. J., who told her that J.J. and T.S. "[l]eft his house and care on Wednesday" and "were with maternal family from Wednesday until Saturday morning."

On cross-examination by counsel for Mr. J., Ms. Gattis admitted to using leading questions inadvertently—for example, Ms. Gattis used the word "penis" in a sentence, instead of referring to it as a "little wee wee," as J.J. had done. Ms. Gattis acknowledged that she did not discuss "truthfulness" with J.J. during the interview because it is "not part of the RATAC protocol." Ms. B.'s counsel questioned Ms. Gattis on inconsistencies in J.J.'s audio-recorded statement: J.J. made conflicting statements to Ms. Gattis whether Mr. J.'s penis "rubbed" or was "in" J.J.; and whether J.J. was partially or fully nude. Ms. B.'s counsel noted the inconsistencies between J.J.'s statement to Ms. Gattis and those she gave to the SAFE and CHAMP examiners. Ms. B.'s counsel also highlighted, as a possible motive for alleging that Mr. J. sexually abused her, J.J.'s statement to Ms. Gattis that she was "trying to stay the night with my grandmom." Ms. Gattis conceded that "[t]here is no document that says from another individual that he had the opportunity" to commit the abuse.

After hearing the above testimony, the court concluded that it would not examine

---

convicted.

J.J. as part of its determination of the particularized guarantees of trustworthiness and admissibility of her statement. Section 11-304(g)(1) directs the court to examine the child victim when making these findings unless "the court determines that an audio or visual recording of the child victim's statement makes an examination of the child victim unnecessary." The court concluded that "the audio recording of the child makes an examination of the child victim unnecessary in this case." The court further stated, "I don't think it would add to my ability to determine whether that statement made back [in August] in light of the questioning had particularized guarantees of trustworthiness. So I'm not going to interview the child."

The juvenile court next addressed whether J.J.'s statement would be admissible for the truth of the matter asserted if she did not testify at the adjudication hearing. Pursuant to CP § 11-304(d)(2)(ii), a child victim's out-of-court statement is admissible when the child does not testify "only if there is corroborative evidence that the alleged offender had the opportunity to commit the alleged abuse or neglect." The Department argued that such corroborative evidence could be found in Mr. J.'s statement to Ms. Gattis that he was the sole caregiver of the children on the nights of the alleged abuse, which was consistent with J.J.'s statement and Ms. Whitworth's testimony. Ms. B.'s counsel argued that the Department had not met its burden to show that such corroborative evidence existed. The juvenile court disagreed, finding corroborative evidence that Mr. J. had the opportunity to sexually abuse J.J., given his pre-hearing statement against interest to Ms. Gattis that he was alone with the children on the dates of the alleged abuse and "the existence that they were all living there."

11

The juvenile court then heard from Petitioners and the Department regarding the thirteen factors set forth in CP § 11-304 for determining the admissibility of J.J.'s out-of-court statement at the subsequent adjudicatory hearing. The juvenile court then made on-the-record findings concerning each statutory factor:[4]

**[(i) the child victim's personal knowledge of the event]**

The child has great personal knowledge of the event. She talks about it in detail about—there is no confusion about what happened in the statement.

**[(ii) the certainty that the statement was made]**

It was clearly made. It was tape-recorded. We all heard it.

**[(iii) any apparent motive to fabricate or exhibit partiality by the child victim, including interest, bias, corruption, or coercion]**

[S]he, in 2013, I think a little more than a year and a half before this incident made the statements about her father and wanted to get the gun and shoot him.
And in addition, there was testimony that the recurrence of this occurs that she may [have been] coerce[d] somewhat by her maternal relatives. So there does exist an apparent motive to exhibit partiality by the child, and there was some testimony about [the] possibility [of] coercion, although nothing specific under that factor.

**[(iv) whether the statement was spontaneous or directly responsive to questions]**

There was some spontaneity in the answers. Most of them were directly responsive to questions.

**[(v) the timing of the statement]**

---

[4] For convenience, we have separated by statutory factors the juvenile court's findings.

12

The timing of the statement is very proximate to the most recent abuse which was the night before. So at least with regard to that, it's very proximate. And then if you go back to Tuesday and Thursday, it was close in time to those, also.

**[(vi) whether the child victim's young age makes it unlikely that the child victim fabricated the statement that represents a graphic, detailed account beyond the child victim's expected knowledge and experience]**

Well, she is 9 years old now, right? Am I right?

And what she described would be beyond the child victim's expected knowledge and experience except for, unfortunately, for this child victim, she is a prior victim of sex abuse. So she may have and in all likelihood does have much more knowledge and experience. So it was an age appropriate statement for a 9-year-old in the sense of, I mean, it was a believable statement in the sense that she wouldn't have that knowledge. We don't know how much knowledge she has if any as a result of having been sexually abused before.

Now, I will talk more about how I'm evaluating that factor when I make my final ruling.[5]

**[(vii) the appropriateness of the terminology of the statement to the child victim's age]**

It was completely appropriate using the terms of wee wee and private parts[.]

**[(viii) the nature and duration of the abuse or neglect]**

She talked about the three specific days that she said. And then she said Tuesday and last night, but also that it started, I think, it was three weeks after she went to see Miss Christine I think we figured out.

**[(ix) the inner consistency and coherence of the statement]**

---

[5] The court made no further mention of this factor. Yet, we can presume that the judge took it into consideration when ruling on the admissibility of J.J.'s statement. *See Aventis Pasteur, Inc. v. Skevofilax*, 396 Md. 405, 426 (2007) (stating that judges are presumed to know the law and apply it, even absent express consideration).

There are things that are inconsistent in this statement. First, there's no clothes on. Then there's clothes on. Where she is during this? But when I look at, and then what happened? . . .

She is not being led in that part, and she is giving it graphically. Then she draws a picture—I mean, she writes a note about the suck. And uses her finger to go in and out of her mouth, I believe, later on when we get through here.

So there is nothing about that that is inconsistent or incoherent. And those are the two—the discussion of the actual events or whatever—the meat of the statement.

**[(x) whether the child victim was suffering pain or distress when making the statement]**

She was, obviously—according to the testimony of Ms. Gattis in some distress, the stress not inconsistent with a 9-year-old making those statements.

**[(xi) whether extrinsic evidence exists to show the defendant or child respondent had an opportunity to commit the act complained of in the child victim's statement]**

In the child victim's statement, there is extrinsic evidence. How convinced the trier of fact will be in light of other evidence does [not] [*sic*] negate the fact that there is extrinsic evidence, and that is his statement against interest to [the Department] and/or the law enforcement officer. I don't know who he made that to exactly, the fact that they all live together in that house. And I don't know what other evidence will come in at trial. But there is extrinsic evidence.

**[(xii) whether the statement was suggested by the use of leading questions]**

There were a lot of leading questions in here. I'm not sure with the social work background that Ms. Gattis has the same understanding of what a leading question is as people with a legal background. But as I was just reading through that part, which I call the meat of the statement, those weren't leading.

And then what happened? And then what? Tell me

14

what you remember.  This is what she says about the oral sex.
Tell me what you remember. . . .

These are not leading questions, at least as to the meat
of anything or the central issues. . . .

[Y]es, there are leading questions.  I do not find that the
salient parts of this statement were suggestive by the use of
leading questions.

**[(xiii) the credibility of the person testifying about the
statement]**

Ms. Gattis was a credible witness.  I didn't—I mean, it
looked to me—I mean, from my evaluation, she was trying just
to evaluate this statement.  She did know in the back of her
mind that there had been earlier allegations.  But I don't find
that that influenced the way she conducted the interview.

Now, whether that had any influence with their finding
of indicated or—I don't know.  But that's not for me to decide
here and now.

Based on its findings concerning each of the above factors, the court, pursuant to

the statute, found that J.J.'s out-of-court statement was admissible pursuant to CP § 11-304:

So I find that there are particularized guarantees of
trustworthiness, and so I will determine that the statement is
admissible as far as the Statute goes.  But, again, I think it's
unclear to me whether at trial, additional evidence on the issue
of opportunity might become relevant, but at this point I find it
to be admissible.

Of note, neither Mr. J. nor Ms. B. argued at any point during the § 11-304 hearing

that J.J. was incompetent to be a witness or asked the court to examine J.J. to determine

her competency.

2.  Adjudication, Disposition, and Appeal

J.J.'s statement was introduced and played at the adjudicatory hearing on December

16, 2015.  At the conclusion of the evidence, the juvenile court found J.J.'s interview and

15

her statements "to be entirely credible." The court sustained the allegations of Mr. J.'s sexual abuse of J.J., stating that "[n]othing has refuted those statements." Mr. J. and Ms. B. noted their exceptions on the record. At the disposition hearing on January 26, 2016, the juvenile court declared both children CINA and committed them to the care and custody of the Department for appropriate placement.

Petitioners each noted an appeal to the Court of Special Appeals. Among other contentions, Mr. J. contended that the juvenile court erred in failing to consider J.J.'s competency as a witness, even though he had not raised that concern before the juvenile court. The Court of Special Appeals, evidently exercising its discretion to address the issue, concluded that J.J's competency to testify as a witness "was not relevant to the admissibility of her statement to Ms. Gattis." *In re: J.J.*, 231 Md. App. at 329. The intermediate appellate court looked to the plain language of the statute, as well as decisions from sister states, and held that CP § 11-304 does not impose a threshold finding of competency prior to admitting a child victim's out-of-court statement. *Id*. at 329–31.

The Court of Special Appeals further held that the juvenile court properly deemed J.J.'s out-of-court-statement to Ms. Gattis admissible at the adjudicatory hearing. The Court of Special Appeals detected no error attendant to the juvenile court's handling of the requirements of CP § 11-304. The intermediate appellate court likewise concluded that the juvenile court did not err, much less clearly err, when, upon addressing each of the statutory factors, the court determined that J.J.'s statement had "particularized guarantees of trustworthiness." *Id*. at 331–35.

We granted both Petitioners' petitions for writ of certiorari to answer three questions:

16

I.    Under Maryland Code Annotated, Criminal Procedure § 11-304, where a child victim does not testify and the juvenile court declines to examine the child in chambers, must the court first find that the child is competent before admitting her statement into evidence at a CINA adjudication hearing for the truth of the matter asserted?

II.   Did the facts in this case establish that J.J. was competent where she did not testify in court and the court did not examine her because it found that her audio-recorded statement made an examination of her unnecessary?

III.  Did J.J's hearsay statement have particularized guarantees of trustworthiness to be allowed into evidence?

## III.

### Discussion

A.  *Competency*

1.  Preservation

Mr. J. argues that a juvenile court, before admitting a child victim's out-of-court statement for the truth of the matter asserted, must first find that the child is "truth competent," meaning that the child understands the distinction between truth and falsehood.  As noted above, Mr. J. did not raise that contention before the juvenile court at any time before or during the § 11-304 hearing; neither, for that matter, did he or Ms. B. attempt to raise the contention at any other juncture during the proceedings before the juvenile court.

Maryland Rule 8-131(a) states that "[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the

17

trial court or to avoid the expense and delay of another appeal." This Court has not been deterred from addressing and deciding, in the appropriate case, a matter that was not timely raised before the trial court. To the contrary, "[w]e have explained time and again that Rule 8-131(a) grants an appellate court discretion to consider issues deemed to have been waived for failure to make a contemporaneous objection." *Abdul-Maleek v. State*, 426 Md. 59, 69 (2012) (citing *Bible v. State*, 411 Md. 138, 148 (2009)). We have exercised such discretion when, for example, doing so "will promote the orderly administration of justice." *See id*. at 70 (quoting *Bible*, 411 Md. at 152). Notwithstanding Mr. J.'s failure to raise the issue before the juvenile court, we shall exercise our discretion under Maryland Rule 8-131 to address the contention, as it is likely to be raised in future cases.[6]

2. The Parties' Contentions

Mr. J. argues that a juvenile court must find that a non-testifying child is truth competent before admitting his or her out-of-court statement into evidence for the truth of the matter asserted. He argues that the juvenile court erred by admitting J.J.'s statement because, "absent any indication that J.J. was capable of distinguishing between the truth and a lie and fantasy and reality, her statement was unreliable" and therefore inadmissible. He admits that the plain language of the statute is "silent with regard to whether the court must make a preliminary determination of the competency of a non-testifying child

---

[6] Mr. J. raises an additional contention that was not presented to the juvenile court or raised or decided by the Court of Special Appeals. He argues in this Court, for the first time, that due process requires a juvenile court to determine the competency of a non-testifying child before admitting the child's out-of-court statement under CP § 11-304. We decline to address that unpreserved argument.

declarant." Nevertheless, he argues that the legislative history suggests that the General Assembly did not intend to admit statements made by a "truth-incompetent declarant."

The Department disagrees, arguing that the plain language and legislative history of CP § 11-304 confirm that the juvenile court was not required to make a threshold competency determination of J.J. prior to admitting her out-of-court statement. The Department looks to the plain language of CP § 11-304, which has no such requirement, and argues that this Court should decline to read a competency requirement into CP § 11-304.

### 3. Analysis

Our analysis begins with the statute itself. In *Phillips v. State*, we summarized the rules of statutory interpretation, noting that we "focus[] primarily on the language of the statute to determine the purpose and intent of the General Assembly." 451 Md. 180, 196 (2017). To effectuate that intent, "[w]e begin our analysis by first looking to the normal, plain meaning of the language of the statute[.]" *Id.* (quoting *Douglas v. State*, 423 Md. 156, 178 (2011)). To ascertain the plain meaning of the language, "[w]e view the plain language of a statute in the context of the statutory scheme to which it belongs." *See Brown v. State*, 454 Md. 546, 551 (2017). "We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with 'forced or subtle interpretations' that limit or extend its application." *State v. Bey*, 452 Md. 255, 265 (2017) (quoting *State v. Johnson*, 415 Md. 413, 421 (2010)); *see also State v. Adams-Bey*, 449 Md. 690, 702 (2016) (declaring that this Court will not read words into a statute "to extend or limit the statute's meaning"). Where statutory

19

language is "clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends." *Phillips*, 451 Md. at 197.

The Department observes, correctly, that CP § 11-304 is silent on whether a juvenile court must make a truth-competency determination prior to ruling on the admissibility of a child's out-of-court statement. Silence, though, is not necessarily dispositive of legislative intent. Rather, "when a statute is silent as to a particular issue, it is appropriate for the Court to consider legislative history." *Nesbit v. Gov't Emps. Ins. Co.*, 382 Md. 65, 77 (2004). We therefore look for guidance to the legislative history of CP § 11-304.

The legislative history confirms that the General Assembly did not intend to impose a requirement upon a juvenile court to determine a child victim's truth competency. In 1988, the General Assembly enacted the tender years statute without any competency requirement. 1988 Md. Laws 3646 (Vol. VI, Ch. 548, S.B. 66); 1988 Md. Laws 3650 (Vol. VI, Ch. 549, H.B. 1018).[7] In 1998, Senate Bill 688 was introduced and proposed, *inter alia*, adding as a statutory factor "[t]he child's ability to distinguish truth from falsehood." S.B. 688, 1998 Leg., Reg. Sess. (Md. 1998). This language would have replaced the existing factor that examined "[w]hether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement." *Id*. By the third reading of the bill, this proposed change had been stricken, and the bill was later signed by the governor without this change. 1998 Md. Laws 3100, 3104 (Vol. V, Ch. 638, S.B. 688). Our research discloses that there was no other legislative attempt to add a competency

---

[7] The tender years exception was first codified at § 9-103.1 in the 1988 Supplement to the Courts and Judicial Proceedings Article.

requirement to the tender years statute since its enactment in 1988.[8]

Accordingly, we reach the same conclusion as did the Court of Special Appeals. Section 11-304 contains no ambiguity. The plain language of that section does not require a juvenile court to find that a child is truth competent before admitting that child's statement under the statute, nor does its legislative history suggest a contrary interpretation.

We also agree with the Court of Special Appeals that a preliminary competency determination is irrelevant to a juvenile court's admissibility determination. There has been no showing, nor do we conclude, that the statute's existing thirteen-factor trustworthiness test would be enhanced by requiring examination of a non-testifying child's competency. Rather, CP § 11-304 imposes multiple conditions that must be satisfied prior to a juvenile court's determination that the statement is admissible: the court must make a finding as to whether (1) it is unnecessary to examine the child; (2) there is corroborative evidence that the alleged abuser had an opportunity to commit the abuse; and (3) the child's statement contains "particularized guarantees of trustworthiness." No additional findings are (or should be) necessary for a statement to be admissible under the statute when the

_____

[8] Although bills were introduced, but never enacted, to admit a child's statement where the child is unavailable to testify at the proceeding due to "incompetence," *see, e.g.*, S.B. 498, 1993 Leg., Reg. Sess. (Md. 1993); S.B. 482, 1992 Leg., Reg. Sess. (Md. 1992); H.B. 548, 1988 Leg., Reg. Sess. (Md. 1988); S.B. 24, 1988 Leg., Reg. Sess. (Md. 1988); *see also, e.g.*, S.B. 340, 1994 Leg., Reg. Sess. (Md. 1994) (introducing an amendment to admit a child's statement when the child is unavailable due to the child's "[l]evel of cognitive development, including ability to understand abstract concepts"), such proposals cannot be read to have imposed a competency determination. To the contrary, under these proposed amendments, any competency determination would have been unnecessary because the juvenile court could admit the child's out-of-court statement notwithstanding a finding of incompetence.

trial judge "compl[ies] with the foundational requirements of that statute." *Jones*, 410 Md. at 700. Accordingly, we agree with the Court of Special Appeals that, "[g]iven the plain language of CP § 11-304, as well as the different concerns regarding the competency of a child witness to testify and the admissibility of a prior out-of-court statement by an abused child, . . . a court need not make a competency determination prior to admitting a prior statement pursuant to CP § 11-304." 231 Md. App. at 331.

Our conclusion is consistent with that of our sister states. *See Commonwealth v. Walter*, 93 A.3d 442, 453 (Pa. 2014) ("[B]ased on the plain language of the [state's tender years statute], . . . we hold that a child need not be deemed competent to testify as a witness in order for the trial court to admit the child's out-of-court statements into evidence pursuant to the [statute]."); *State v. Silverman*, 906 N.E.2d 427, 434 (Ohio 2009) (holding "that a hearsay statement of a child declarant can be admitted under [the state's tender years rule of evidence] without a determination of the child's competence to testify"); *State v. C.J.*, 63 P.3d 765, 770 (Wash. 2003) (en banc) ("The statute's prerequisites to the admissibility of a child victim's hearsay statements do not include any requirement that a declarant must be shown to have . . . the ability to distinguish the difference between truthful and false statements and an understanding of an obligation to tell the truth."); *People v. Dist. Court of El Paso Cty.*, 776 P.2d 1083, 1088 (Colo. 1989) (en banc) ("[W]e reject the logically flawed assumption that a determination of incompetency at the time of the hearing invariably establishes that the child's statement was not reliable.").

In summary, nowhere in CP § 11-304 or the legislative history is there support for Mr. J.'s argument that truth competency is a prerequisite or relevant to the admission of a

22

child victim's out-of-court statement for the truth of the matter asserted. We therefore hold that CP § 11-304 imposes no duty on the part of the juvenile court, beyond those duties set forth in the statute, to determine a child's truth competency. Accordingly, we have no need to address the second question presented by Mr. J. concerning whether J.J. herself was competent.

## B. *Trustworthiness*

### 1. The Standard of Review

We turn now to the admissibility under CP § 11-304 of J.J.'s out-of-court statement to Ms. Gattis. This Court applies the clearly erroneous standard of review to the juvenile court's factual findings made under CP § 11-304. *See Jones*, 410 Md. at 700 ("The 'clearly erroneous' standard of review is applicable to the factual findings required by this statute."); Md. Rule 8-131(c). A decision is not clearly erroneous "'if the record shows that there is legally sufficient evidence to support it.'" *Kusi v. State*, 438 Md. 362, 380 (2014) (quoting *Biglari v. State*, 156 Md. App. 657, 668 (2004)).

### 2. The Parties' Contentions

Ms. B. argues that the juvenile court clearly erred by admitting J.J.'s statement because her statement did not possess particularized guarantees of trustworthiness. First, though not a statutory factor under CP § 11-304, Ms. B. argues that J.J.'s statement did not possess particularized guarantees of trustworthiness because it was not "consistently repeated." She points to J.J.'s inconsistent statements to Ms. Gattis and the SAFE and CHAMP examiners about the extent and dates of the abuse. In support of this argument, Ms. B. relies on *Idaho v. Wright*, 497 U.S. 805 (1990), which provides that, in

23

Confrontation Clause cases, "consistent repetition" is a factor to determine reliability in child hearsay statements, *id*. at 821–22.  Next, Ms. B. argues that there was insufficient corroborative evidence of Mr. J.'s opportunity to commit the abuse.  In Ms. B.'s view, it was not enough that the court found corroborating evidence in Mr. J.'s statement against interest that "they were all living there"; Ms. Whitworth had no information concerning whether J.J. or T.S. were in fact residing with Mr. J. on the alleged dates of the abuse.

Ms. B. further argues that J.J. was motivated to fabricate her statement based on J.J.'s previous "false" allegations of sexual abuse by her father, her "homicidal ideations towards her father," and her past "influenc[e] by others."  Though the juvenile court acknowledged that "there does exist an apparent motive to exhibit partiality by the child," Ms. B. highlights that the court failed to discuss how motive weighed in its trustworthiness finding.  Ms. B. also claims that the juvenile court erred when it considered the degree to which J.J.'s answers were either directly responsive to questions or spontaneous.  In particular, while the court noted "some spontaneity" in J.J.'s answers, Ms. B. contends that the court should have considered not only J.J.'s spontaneity, but also what Ms. B. characterizes as J.J.'s past manipulation by maternal relatives to fabricate sexual abuse and J.J.'s motive to fabricate.  Ms. B. also contends that the juvenile court erred by admitting J.J.'s statement due to the number of leading questions in the interview.  She suggests that, because a significant number of the questions were leading, the entire interview was tainted.

Finally, Ms. B. argues that the court erred when it gave insufficient weight to J.J.'s prior victimization by her cousin when it considered whether J.J.'s described events were

24

beyond her expected knowledge and experience. To illustrate this point, Ms. B. highlights the court's remarks on the subject: "I don't know how the fact that there were prior investigations or prior incidents of abuse might contribute to the child's knowledge and go to what she would be able or not able to say."

The Department responds that the juvenile court fully complied "with the foundational requirements of that statute, including the requirement that the court 'make a finding on the record as to the specific guarantees of trustworthiness that are in the statement[.]'" *Jones*, 410 Md. at 700–01 (quoting CP § 11-304(f)(1)). The Department argues that the evidence at the § 11-304 hearing was sufficient for the juvenile court to make its findings. The Department reiterates the juvenile court's analysis that J.J. showed she had "great personal knowledge of the event" and contends that she could provide sensory details of the abuse and describe in detail where and how the abuse occurred, including through illustrations and demonstrations. The Department argues that any inconsistencies between J.J.'s forensic interview and statements that she gave to others go to weight and not admissibility under the statute, which requires the court to consider only a statement's internal consistencies. CP § 11-304(e)(2)(ix). The Department adds that the court correctly found that corroborative evidence showed Mr. J. had the opportunity to commit the abuse.

3. Analysis

We are persuaded, for the reasons that follow, that the juvenile court did not err, much less clearly so, in concluding that J.J.'s out-of-court statement possessed "particularized guarantees of trustworthiness" as required by CP § 11-304. At the § 11-304

25

hearing, the juvenile court fully "compl[ied] with the foundational requirements of that statute, including the requirement that the court 'make a finding on the record as to the specific guarantees of trustworthiness that are in the statement.'" *Jones*, 410 Md. at 700 (quoting CP § 11-304(f)(1)). The court played the audiotape of J.J.'s out-of-court statement, heard testimony and argument, and considered the evidence. Pursuant to CP § 11-304(f)(1), the court made on-the-record findings as to the requisite guarantees of trustworthiness of J.J.'s statement. The court addressed each of the thirteen statutory factors and deemed J.J.'s statement to be admissible under CP § 11-304.

We reject Ms. B.'s argument that the juvenile court was required to consider as a factor whether J.J.'s statement was "consistently repeated" pursuant to *Idaho v. Wright*. *Wright* was replaced by *Crawford v. Washington*, 541 U.S. 36 (2004), as the seminal case on confrontation, and *Wright* only spoke of the need for this finding in a criminal context, where the right to confrontation attaches. In contrast, Maryland courts have found that the right to confrontation does not apply in civil, let alone CINA, proceedings. *Tyler v. State*, 342 Md. 766, 774 n.4 (1996) ("In a civil case, there is no need to protect the defendant's right of confrontation."); *In re Colin R.*, 63 Md. App. 684, 693–94 (1985) ("[T]he right of confrontation . . . is not available to the parents of an alleged C.I.N.A.").

We further note that consistent repetition is not an enumerated factor of CP § 11-304 that the juvenile court "shall consider" when determining admissibility. Instead, the juvenile court need only consider "the inner consistency and coherence of the statement." CP § 11-304(e)(2)(ix). Although the court "is not limited to" the enumerated factors, CP § 11-304(e)(2), we agree with the Department that any inconsistencies between

26

J.J.'s statement to Ms. Gattis and statements she gave to others go to weight and not admissibility.

Our review of the record reflects that the juvenile court's treatment of the requisite statutory factors was exacting and fully considered, and that it "compl[ied] with the foundational requirements" of CP § 11-304. *Jones*, 410 Md. at 700. We likewise reject Ms. B.'s arguments that the juvenile court improperly weighed the factors in its analysis. It is for the juvenile court, and not us, to weigh the evidence and make factual findings in accordance with that evidence. *See* Md. Rule 8-131(c).

We hold that, because there was legally sufficient evidence to support the juvenile court's findings, we find no error in the court's conclusion that J.J.'s statement had particularized guarantees of trustworthiness to be admissible for the truth of the matter asserted under CP § 11-304.

## IV.

## Conclusion

We hold that the CP § 11-304 does not require a juvenile court to make a competency determination prior to ruling on the admissibility of a child declarant's out-of-court statement for the truth of the matter asserted. Such a preliminary competency determination is likewise irrelevant when determining whether a child victim's statement contains "particularized guarantees of trustworthiness" to be admissible under CP § 11-304. We further hold that the juvenile court did not err in concluding that J.J.'s out-of-court statement was admissible in her juvenile court proceeding because her statement contains the requisite "particularized guarantees of trustworthiness" for admission pursuant

27

to CP § 11-304. We therefore affirm the judgment of the Court of Special Appeals, which came to the same conclusions.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID 50% BY PETITIONER FATHER AND 50% BY PETITIONER MOTHER.**